Pawl E. HOLLIS, Plaintiff,

v.

ROCK CREEK PACK STATION, a partnership, and Herbert London, Marjorie London and Craig London, partners, associated and in business under the common name and style of said company, Defendants.

No. CV–R–82–135–ECR.

United States District Court, D. Nevada.

July 9, 1984.

Pawl and Craig grew up together in Bishop, California, and were "best friends". Herb knew Pawl from the time he was a small boy. Pawl worked on and off for Rock Creek for a period of about ten years (1971–1981). He worked at first on a gratis basis, helping out as a friend of the Londons, and later became an employee. When he was in high school Pawl was employed as a cook by Rock Creek and later became an expert packer for the wilderness pack trips conducted for the customers of Rock Creek. Most of Rock Creek's pack trips are conducted during the summer months from approximately the first of June until the middle of September or first of October. Other business is transacted during the off season, including stock tending, ranch chores, vehicle maintenance, organizing pack trips for subsequent years, soliciting of business, bookkeeping, and tax work.

During a portion of the period involved here Pawl was seeking a teaching credential from the University of Nevada in Reno. In the summers of 1979 and 1980 he assisted with Rock Creek pack trips and attended college in the winter time. Pawl became interested in becoming a partner in Rock Creek during 1979 and particularly in 1980 after he completed his college education. Pawl's long-range goals were to teach school and also to make a career of packing. Since the principal activity in packing is in the summer when school is in recess the dual careers mesh very well together. In 1979, Pawl therefore approached Craig and Herb with regard to the possibility of becoming a partner in Rock Creek.

*First Agreement*

In 1980, prior to the commencement of the packing season, serious discussions took place between Herb, Craig and Pawl concerning how Pawl might become a partner of the enterprise. The Londons and Pawl were very interested in having Pawl come into the business as a partner. On March 1, 1980 Herb prepared an estimated

E. Pierre Gezelin, Reno, Nev., for plaintiff.

Bruce D. Roberts, Reno, Nev., for defendants.

## MEMORANDUM DECISION AND ORDER

EDWARD C. REED, Jr., District Judge.

The plaintiff, Pawl Hollis (Pawl) brought this action seeking to establish that he was a partner of the defendants in an enterprise known as the Rock Creek Pack Station (Rock Creek) during the period from January 1 to November 1, 1981.[1] Rock Creek is in the business of outfitting and guiding pack trips in the eastern Sierras. It is owned by the London defendants: Herbert, the father, (Herb), Marjorie, the mother, (Marjorie)[2] and their son, Dr. Craig London, (Craig). Pawl is a citizen of Nevada and the defendants are citizens of California. The jurisiction of this court is invoked under 28 U.S.C. § 1332.

---

**1.** The bifurcated bench trial held on April 25 and 26, 1984, dealt solely with this issue.

**2.** The interests of Herb and Marjorie are jointly referred to under Herb's name in this decision.

valuation of the assets of Rock Creek for use by the parties in negotiating Pawl's acquisition of an interest in the Rock Creek partnership. The value Herb placed on the assets of the business was $420,000.00. After study with his consultant, Pawl placed a value of $275,000 on the assets and the parties eventually compromised at a figure of $350,000. The parties agreed that Pawl would acquire a one-third interest in Rock Creek for a purchase price of $116,666.66 at a down payment of 26%, with the balance to be amortized over a 15 year period at 10% interest. According to this arrangement Pawl was to work from June 1 to October 15, 1980, for $1,000.00 a month and to receive an additional bonus of $5,000.00 (at $1,000.00 per month) for completing the season. The parties agreed that the bonus would be applied toward the down payment. They set up a schedule for completing the transaction, which provided for agreement in principle by April 1, 1980, and a final formalized arrangement by November 1, 1980.

The parties went ahead with the arrangement through the packing year of 1980, but when November 1 arrived Pawl did not have the money available to make the anticipated down payment and hence the agreement for him to acquire an interest in the partnership fell through. The parties did not give up, however, and continued discussions and negotiations looking to Pawl's acquisition of an interest in the partnership in the following year.

### Second Agreement

On December 21, 1980, a meeting was held by Pawl, Craig and Herb. The $350,-000.00 total value was reexamined and the parties appear to have tentatively agreed at that time that Pawl would acquire a one-third interest in Rock Creek for a price of $116,666.66 with a down payment of 26.38%, or $30,333.33. The down payment was to be loaned to Pawl by the Londons at

the then current rate of interest. The $5,000.00 bonus which had been discussed in 1980 was to be credited to the down payment, reducing it to $25,333.33.[3] The balance of the purchase price, over and above the downpayment, was to be payable at 10% interest over a period of 15 years either on a monthly or yearly basis. This tentative agreement is for the most part memorialized in a letter from Pawl to Herb, dated December 30, 1980 (Exh. E).

Herb took Pawl's letter to Willis Smith, an attorney practicing in Bishop, California, and consulted with him about the transaction. On January 6, 1981, Mr. Smith wrote to Herb analyzing the transaction and making certain suggestions. He recommended that the $5,000.00 1980 bonus which the parties had agreed would be applied to the down payment, instead be subtracted from the purchase price, reducing it to $111,666.66. This would avoid payment of income tax by Pawl on the $5,000.00 bonus and diminish capital gains taxes on Pawl's payments to the Londons. The effect of Mr. Smith's proposals is to reduce the agreed overall value of the assets of the partnership. Mr. Smith also reviewed the various types of business organizations which would be most advantageous to the parties both from a legal and tax viewpoint. He recommended that a Subchapter S corporation be formed so as to retain the benefits of partnership-type taxation and to obtain the benefits of the limited liability of a corporation.[4]

### Third Agreement

By the end of March 1981 the parties had finally agreed to an arrangement whereby Rock Creek would become a Subchapter S corporation as of November 1, 1981, and Pawl would purchase a one-third interest in the corporation for the figure of $111,-666.66. A down payment of $25,333.33

3. That sum was to be payable one-third on November 1, 1981, one-third April 1, 1982, and one-third September 1, 1982, each payment to be plus interest on the loan of the down payment.

4. Pawl was to consult with his own legal counsel and accountants concerning the tentative agreement and Mr. Smith's recommendations.

was to be paid in three installments as follows:

Nov. 1, 1981: $8444.44 plus interest on $25,333.33 for 10 months @ 20.25% for total of $12,719.44.

April 1, 1982: $8444.44 plus interest on $16,888.88 @ 20.25% for five months.

September 1, 1982: $8444.44 plus interest @ 20.25% for four months.

According to this agreement, the balance of the purchase price was to be due in annual installment payments over a 15-year period at 10% interest commencing November 1, 1981.

On this basis, under the agreement, Pawl would owe the following sums on November 1, 1981 in order to close the transaction:

| | |
|---|---|
| First portion of down payment | $12,719.44 |
| Annual payment on balance | 11,133.60 |
| Total due November 1, 1981 | $23,853.04 |

As a part of the agreement of March, 1981, Pawl was to be entitled to share in income of Rock Creek in the amount of $15,000.00 for 1981, and was to receive as against that share of the profits a salary of $1,250.00 per month. Pawl was also to be entitled to a fractional share of 9½/36 of profits of Rock Creek above $48,000.00 for the operations in 1981.

In connection with the agreement the Londons and Pawl were assigned various jobs and duties for the operation of Rock Creek during the year 1981. However, while the duties assigned to plaintiff involved some responsibility, they do not compel a conclusion that he was thereby regarded as a partner.

The preponderance of the evidence is that the parties agreed to the arrangement described above, the financial provisions of which are set forth in a "Summary of Meeting" (dated March 29, 1981) (Defendants' Exh. F). As Pawl testified, it had been agreed that he was going to buy into the business. The figures in Exhibit F were subject to some refinement by the attorneys and accountants to correct, for example, mathematical errors, but such an-

ticipated changes would not materially alter the agreed obligations of the parties.

■ Having considered the oral and documentary evidence relating to their agreement, we conclude that the parties specifically intended that Pawl's acquisition of a one-third interest in the Subchapter S corporation be subject to his performing his obligations under the agreement. The performance of Pawl's duties under the contract was a condition precedent to his being retroactively (i.e., as of January 1, 1981) treated as a partner for the period of 1981 until the corporation was formed on November 1, 1981. Thus, if Pawl had performed under the contract, he would have been entitled to be treated as a partner on the basis set out in the agreement referred to in Exhibit F. If Pawl did not perform his obligations under the agreement, then he was not entitled to be treated as a partner for that portion of 1981.

The operation of the business went well through the year 1981 and while it did not produce quite as much profit as had been hoped, the profits were substantial. In October of 1981 Herb prepared a spread sheet (Exhibit G) to reflect the business operations for 1981. The figures in Exhibit G were also subject to some refinement by the accountants for example to reflect depreciation but such modifications would not have materially affected the accounting for the year's business.

*Final Meeting*

A meeting was held on October 27, 1981 between Herb, Craig and Pawl to review the operations for the year and to make arrangements to close the transaction. Under the agreement reflected in the memorandum of March 29, 1981, Pawl was to be required to pay $23,853.04 on November 1, 1981, to acquire the one-third interest in the Subchapter S corporation. According to the spread sheet, as against this obligation Pawl was entitled, pursuant to the formula set out in Exhibit F to a credit of $9,977.39. This sum represented his share of the profits of Rock Creek above $48,-000.00, leaving the sum of $13,875.65 pay-

able by him to the Londons on November 1, 1981.

When advised at the meeting as to how the figures had come out, Pawl refused to proceed with the transaction. He told the Londons that he felt he could not justify borrowing that much money at the then current rate of interest. He told Herb and Craig, "I'm not going to go through with it." In his deposition Pawl testified, "I thought it over quite a bit and some other considerations, I felt that I just financially couldn't do it. . . ." The monetary demand on him resulting from the agreement was, in Pawl's view, "just too much."

Pawl apparently had hoped that his share of the profits would defray a greater portion of the down payment than it actually did. However, Pawl knew in advance of the October 27, 1981, meeting that he would probably have to come up with something approaching the figure that was eventually determined to be required. He may have thought that through an increase in the charges for pack trips, which was made for the 1981 season, the profit would turn out to be higher. But once the result of the business operations for 1981 was determined, Pawl believed that in view of the amount of money he would have to borrow to go through with the transaction that it was not a profitable business deal and decided to walk away from it and not to perform the obligation to make the down payment required by the agreement set out in Exhibit F.

## ANALYSIS

In determining plaintiff's rights, if any, under the partnership agreement, we apply California law,[5] following "[d]ecisions of the California Courts of Appeal ... where the Supreme Court of California has not spoken on the question [and] 'in the absence of convincing evidence that the high-est court of the state would decide differently.'" *Community National Bank v. Fidelity & Deposit Co.,* 563 F.2d 1319, 1321 n. 1 (9th Cir.1977).

■ "A partnership is an association of two or more persons to carry on as co-owners a business for profit." Cal.Corp. Code § 15006. "Whether or not a partnership relationship exists is determinable by the intent of the parties to do things which constitute a partnership." *Kaufman-Brown Potato Co. v. Long,* 182 F.2d 594, 599 (9th Cir.1950) (decided under California law). Determination of whether the parties have intended to create a relation involving cooperative effort (such as a partnership or joint venture) is determined in accordance with the ordinary rules governing the interpretation and construction of contracts. *Universal Sales Corp. v. California Press Mfg. Co.,* 20 Cal.2d 751, 128 P.2d 665, 673 (1942).[6] In determining the intent of the parties, the actions and conduct of the parties may be considered in addition to the words of the agreement itself. *Lusher v. Silver,* 70 Cal.App.2d 586, 161 P.2d 472, 473 (1945).[7] Finally, where parties purport to establish a partnership to engage in business upon the happening of a contingency, the partnership does not come into being until the contingency has occurred. *Solomont v. Polk Development Co.,* 245 Cal.App.2d 488, 54 Cal.Rptr. 22, 27 (1966); 68 C.J.S. Partnership § 11 (1950).

Plaintiff cites *Whitley v. Bradley,* 13 Cal.App. 720, 110 P. 596 (1910), for the proposition that it is not essential to the existence of a partnership that all parties contribute capital. However, the *Whitley* court went on to state that the failure of a party to put money into a business was a factor that could tend "to negative the proposition of a partnership, ..." and that as such it would be worthy of "such weight

---

5. See Order [on Motion for Summary Judgment] (Document # 38) at 3.

6. Under California law, the legal principles governing both partnerships and joint ventures are essentially the same. *Irer v. Gawn,* 99 Cal.App. 17, 277 P. 1053, 1056 (1929); 6 B. Witkin, Summary of California Law, Partnership § 17 at 4268 (1974).

7. This is particularly true in the present case, since the documents submitted to the Court do not purport to express the complete agreement of the parties.

as the [trial] court deemed it entitled to ...." 110 P. at 599.

In the present case, we believe the fact that Pawl failed to meet his contractual obligation to contribute capital to the enterprise is entitled to significant weight. As indicated above, we are convinced that the parties did not intend for him to become a co-owner of the business within the meaning of Cal.Corp.Code § 15006 without first making such a contribution. Instead, the capital contribution was a contingent event, and the failure of that event to occur prevented the new partnership from coming into existence. *See Solomont, supra; Taylor v. Nelson*, 26 Cal.App. 681, 147 P. 1189, 1190 (1915).

We recognize that California courts are not inclined to find that a particular provision in a contract is a condition precedent unless such a construction is compelled and plainly expressed by the language of the contract. *Minthorne v. Seeburg Corp.*, 397 F.2d 237, 241 (9th Cir.1968) *cert. denied* 397 U.S. 1036, 90 S.Ct. 1357, 25 L.Ed.2d 647 (1970) (decided under California law). However, we are satisfied that such a construction is in fact warranted in the present case. Pawl did not perform his duties under the agreement to acquire the interest in the corporation and therefore was not entitled to be treated as a partner for the period January 1, 1981, to November 1, 1981. His right to be treated as a partner for that period was conditioned upon his making the down payment which he did not do. Pawl was not entitled to share in the profits of the business because he chose not to become a partner. He was entitled to retain his salary of $1,250.00 a month from January 1, 1981, to November 1, 1981. But when he walked away from

the deal he had no further interest in the partnership or claim against it.[8]

██ Furthermore, since the parties at all times intended that the $5,000 bonus be used only for capital acquisition, Pawl has no right to now claim it as salary that has been withheld by the defendants.[9]

This memorandum decision shall constitute the Court's findings of fact and conclusions of law.

IT IS, THEREFORE, HEREBY ORDERED that the Clerk of the Court shall enter judgment in favor of defendants and against plaintiff.

---

8. For the purposes of this Order, the precise form of the association (i.e., partnership or Subchapter S corporation) contemplated by the parties is immaterial.

9. There was testimony that in 1980 good packers could be hired for approximately $1,000 per month. Pawl's salary as a packer normally would have been between $1,000 and $1,250 per month. If the bonus was regarded as part of Pawl's salary, defendants would have been paying him almost twice as much as they paid other packers. There is no evidence that the defendants intended to do this, and there is convincing evidence that the bonus was intended solely to help Pawl acquire an interest in Rock Creek. Plaintiff also contends that he is entitled to $1,250 per month as salary for the last two months of 1981. Plaintiff's Trial Brief (Document # 60) at 2 and 3. However, there is no evidence that plaintiff did any work for Rock Creek during that two-month period.