BYRON C. RADAKER and SHIRLEY RADAKER, Appellants and Cross-Respondents, *v.* LOUIS E. SCOTT and PHYLLIS SCOTT, Respondents and Cross-Appellants, and DAN TONNEMACHER dba METAMORPHOSIS, Respondent.

No. 23364

July 8, 1993                                          855 P.2d 1037

---

*Gunderson, Mehesan & Wenzel,* Reno, for Appellants and Cross-Respondents.

*Lionel Sawyer & Collins, Richard W. Horton* and *Christopher R. Hooper,* Reno, for Respondents and Cross-Appellants.

*Dan Tonnemacher,* Incline Village, in Proper Person.

## OPINION

*Per Curiam:*

Appellants Byron C. Radaker and Shirley A. Radaker (collectively "Radaker") purchased a house in Incline Village which was built pursuant to an agreement between respondents Louis E. Scott, Phyllis Scott (collectively "Scott") and Dan Tonnemacher. Several months after Radaker purchased the house, various structural defects were discovered. Thereafter, Radaker commenced this action to recover costs based upon, *inter alia,* breach of implied warranty of habitability and misrepresentation. The district court determined that a joint venture existed between Scott and Tonnemacher and that the venturers were liable for the defects discovered in and around the house. However, the district court apportioned liability between the respondents based upon the actions of each venturer. From that judgment, Radaker and Scott appeal. We conclude as a matter of law that where a joint venture exists, co-venturers are jointly and severally liable for *all acts* which arise out of the joint venture. We therefore reverse and remand.

### FACTS

In July of 1984, Scott purchased a lot in Incline Village, commonly known as 571 Putter Court, for the purpose of building a retirement home. Later, however, Scott determined that health problems necessitated building elsewhere. Scott was eventually persuaded that the property would be easier to sell with a house constructed on the lot. Scott thereafter negotiated with Tonnemacher to build a house on the property.[1] As a result of the negotiations, Scott's attorney drafted a "Contract for Construction of House for Sale." The specified objectives of the contract were: (1) to recover the Scotts' investment in the lot; (2) to build and sell a good-quality home on the lot; (3) to complete the house within a designated time frame; (4) to provide an unusually

---

[1]Dan Tonnemacher was a partner with his father, Ken Tonnemacher, and had retained a general contractor's license under the business name of Metamorphosis. However, the contract was between the Scotts and Dan Tonnemacher, individually, and not with Tonnemacher's licensed construction company, Metamorphosis.

attractive financial incentive to Tonnemacher; and (5) to make a profit for both parties. The additional contents of the contract will be discussed as necessary in the course of this opinion.

The parties executed the contract and commenced performing their respective duties under the terms of the agreement. Scott became the owner/builder and the necessary building permits were obtained in Scott's name. The announced purpose for the owner/builder designation was that "the house could be built easier, quicker, simpler and cheaper" by avoiding certain rules and regulations that were applicable to licensed contractors, but not to owner/builders. In the capacity as owner/builder, Scott established a checking account titled "Scott Construction Company." Scott paid Tonnemacher, subcontractors and material men directly from this account. In addition, workers' compensation coverage was obtained in Scott's name for the purpose of insuring the workers employed in the building of the house.

Tonnemacher began construction after the execution of the contract, and in June of 1987, as the project neared completion, Radaker expressed interest in the purchase of the house. On at least two occasions, Radaker visited the site of the house and spoke with Tonnemacher. During those conversations, Tonnemacher indicated that the house was of a high quality and constructed with "the best quality kind of materials" with assurances built into the house, making it "structurally sound and a wonderful product." In addition, Radaker was presented with a brochure of the house which described it as a "two-story masterpiece" which "boasts all the special features you would expect in a quality home."

Ultimately, Radaker agreed to purchase the house and executed a Residential Purchase Agreement. In connection with the purchase agreement, a Seller's Property Disclosure Statement was executed by Scott's son in the capacity of attorney in fact. The Disclosure Statement authorized Tonnemacher as "the agent in this transaction" to publish the information contained in the disclosure statement to interested real estate agents and brokers and prospective purchasers of the property. Furthermore, the disclosure statement designated Scott as the contractor.

Although Radaker did not immediately move into the house, shortly after doing so the buyers became aware of, among other problems, stress fractures in the dry wall and leaks in the sky lights. These concerns prompted several complete structural investigations by professional building consultants which revealed some "128 structural defects, several of [which were] problems so obvious and ominous that they threatened the integrity of the building to the point that the safety of the residence's occupants was in jeopardy." Even Tonnemacher conceded at trial

that the house was not built according to plans and specifications approved by the engineer. Tonnemacher claimed, however, that Scott verbally approved a majority of the variations from the plans.

After the discovery of the structural deficiencies, Radaker hired several licensed contractors to repair the house. Radaker also filed this action against Tonnemacher and Scott, alleging that Scott and Tonnemacher were either joint venturers or partners in the construction of the house. The complaint further alleged that several construction deficiencies and inadequacies were not disclosed to Radaker prior to the close of escrow. Scott denied liability and cross-claimed against Tonnemacher for indemnification. Tonnemacher denied the allegations of both Radaker and Scott.

After a bench trial, the district court determined that the contract between Scott and Tonnemacher created a joint venture. Furthermore, the district court found that the residence was not constructed in a workmanlike manner, that there was a breach of contract, misrepresentation, breach of express warranty and negligent construction. The court also determined that Scott and Tonnemacher should be held jointly and severally liable in the amount of $91,260.57 for breach of the implied warranty of habitability. However, the district court individually found and assessed liability in the sum of $132,402.48 against Tonnemacher for intentional misrepresentation. Thereafter, the district court entered judgment on Scott's cross-claim for indemnification from Tonnemacher based upon the indemnity agreement between Scott and Tonnemacher. This appeal ensued.

## DISCUSSION

"Where the trial court, sitting without a jury, makes a determination predicated upon conflicting evidence, that determination will not be disturbed on appeal where supported by substantial evidence." Trident Constr. v. West Electric, 105 Nev. 423, 427, 776 P.2d 1239, 1241 (1989). Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion." State Emp. Security v. Hilton Hotels, 102 Nev. 606, 608, 729 P.2d 497, 498 (1986). Accordingly, a district court's findings will not be set aside unless they are clearly erroneous. Hermann Trust v. Varco-Pruden Bldgs., 106 Nev. 564, 566, 796 P.2d 590, 592 (1990).

### Joint Venture

Scott argues that the district court improperly concluded that

the contract with Tonnemacher created a joint venture. We disagree. This court has defined the elements of a joint venture as follows:

> A joint venture is a contractual relationship in the nature of an informal partnership wherein two or more persons conduct some business enterprise, agreeing to share jointly, or in proportion to capital contributed, in profits and losses. (Citation omitted.)

Bruttomesso v. Las Vegas Met. Police Dept., 95 Nev. 151, 154, 591 P.2d 254, 256 (1979). Furthermore, the principles of law regarding general partnerships encompass joint ventures. Haertel v. Sonshine Carpet Co., 102 Nev. 614, 616, 730 P.2d 428, 429 (1986). This being the case, an examination of the Uniform Partnership Act, NRS Chapter 87, provides insight. NRS 87.060 defines a partnership as an association of two or more persons to carry on as co-owners a business for profit. NRS 87.130 indicates that the partnership will be bound where loss or injury is inflicted upon a third party by a partner acting in the ordinary course of the business of the partnership. Moreover, all partners are to be held liable jointly and severally for everything chargeable to the partnership under NRS 87.130. See NRS 87.150. The parties' intent to create a joint venture is determined by the application of ordinary rules concerning the interpretation and construction of contracts as well as a consideration of the actions and conduct of the parties. Hollis v. Rock Creek Pack Station, 594 F.Supp. 156, 160 (D.Nev. 1984).

An examination of the contract between Scott and Tonnemacher reveals a contractual relationship and commitment to "develop jointly a house for sale. . . ." each party was assigned specific duties under the contract. Tonnemacher was "responsible for all aspects of construction" in conformance with building plans to be approved by both parties. Any modifications in the construction of the house were to be agreed upon by both parties. Tonnemacher was also responsible for purchasing material, hiring employees and subcontractors and securing industrial insurance, all of which were financed by Scott. In addition to Scott's duty to finance the operation, he was to act as the seller of the house. The contract specifies that:

> Scott has sole and final authority to decide whether and when to sell the house and upon the price and conditions of sale, but agrees to accept any offer of more than $700,000 entirely in cash if Tonnemacher so requests. Tonnemacher agrees to advise Scott on the sale of the house and to use his knowledge and resources to facilitate a satisfactory sale.

Accordingly, while the contract provides specific duties for each of the parties, both parties could control the actions of the other to a certain extent.

The contract also indicates the manner in which profits were to be distributed:

> After the sale of the house, the Net Profit will be apportioned as follows:
>
> (a) The first $35,000 to Tonnemacher, minus any excess chargeable to him pursuant to paragraph 6.
>
> (b) The next $35,000 to Scott.
>
> (c) The next $50,000 divided equally between Tonnemacher and Scott.
>
> (d) Any remainder divided one-fourth to Tonnemacher and three-fourths to Scott.

The manner in which losses were to be allocated is not specifically provided for. However, in the event Tonnemacher was unable to construct the house for the target cost of $290,000, one-half of the total overrun would be charged to him. Thus, impliedly, Scott would be charged with the remaining one-half.

Scott indicates that "[t]here was no evidence that the joint venture found by the District Court owned any property, obtained any licenses or permits, incurred any bills, or that it had a bank account." Although the joint venture did not obtain any licenses or permits, incur any bills or open a bank account in the name of the joint venture, the co-venturers did in fact engage in all of those functions. Furthermore, the parties agreed that Scott would act as the owner/builder. The fact that Scott acted in that capacity and received certain financial benefits therefrom that did not inure to the joint venture did not affect either the nature or the scope of the joint venture or the relationship of the venture parties.

Both parties understood the synergistic effect of their respective contributions to the joint venture and its potential for profit. What neither could accomplish alone, the two could accomplish together as joint venturers. The nature of the relationship was unaffected by the fact that Scott's contributions to the venture could, in large measure, outwardly be viewed as attributable to him alone. Scott and Tonnemacher both agreed upon the roles they were to assume in accomplishing the mutually beneficial purposes of the joint venture.

Based upon the above factors, we conclude that the district court was correct in determining that Scott and Tonnemacher formed a joint venture. Both the contract and the conduct of the parties support the conclusion reached by the lower court.

### Liability of Co-Venturers

Once the district court determined that a joint venture existed

between Scott and Tonnemacher for the construction and sale of a house, it was not at liberty to apportion liability between the parties insofar as Radaker was concerned.

All members of a joint venture are jointly and severally liable to third persons for wrongful acts committed in furtherance of the joint enterprise. Moreover, under principles of law related to joint ventures, the negligence or fraud of one venturer, while acting within the scope of the enterprise, may be imputed to co-venturers so as to render the latter liable for the injuries sustained by third persons as a result of the negligence or fraud. *See* NRS 87.150 (all partners jointly and severally liable); *and see* Christensen v. Superior Court, 820 P.2d 181, 195 (Cal. 1991); Tanner Companies v. Superior Court, 696 P.2d 693, 695 (Ariz. 1985); Martin v. Chapel, Wilkinson, Riggs and Abney, 637 P.2d 81, 85-86 (Okla. 1981); Stone-Fox, Inc. v. Vandehey Dev. Co., 626 P.2d 1365, 1368-69 (Or. 1981); and Holiday v. Bannister, 741 P.2d 89, 93 (Wyo. 1987). We conclude that the district court erred in apportioning the liability between the two venturers insofar as the apportionment applied to Radaker. As previously stated, Scott and Tonnemacher are both jointly and severally liable to Radaker for all damages sustained by the latter.

### Implied Warranty of Habitability

Scott contends that even if the court properly found him to be an owner/builder, the court incorrectly determined that an owner/builder grants an implied warranty of habitability to a purchaser. The implied warranty of habitability was first adopted by the English courts under the rationale that builders knew that buyers intended to live in the houses that were being marketed, therefore the builders impliedly warranted to the purchasers of unfinished houses that they would be habitable. Miller v. Cannon Hill Estates, Ltd., 2 K.B. 113 (1931).

The English rule concerning the implied warranty of habitability was first adopted in the United States in 1957 by an Ohio court. Vanderschrier v. Aaron, 140 N.E.2d 819, 821 (Ohio Ct.App. 1957). Then in 1964, the implied warranty of habitability was expanded to include completed housing. Carpenter v. Donohoe, 388 P.2d 399, 402 (Colo. 1964). The Supreme Court of Illinois indicated that the warranty of habitability is a creature of public policy designed to protect purchasers of new houses who are victims of latent defects in construction. Redarowicz v. Ohlendorf, 441 N.E.2d 324, 330 (Ill. 1982).

Mr. Justice Cardozo recognized the need to replace the antiquated rule of *caveat emptor* when he indicated the following:

> A rule which in its origin was the creation of the courts themselves, and was supposed in the making to express the *mores* of the day, may be abrogated by courts when the *mores* have so changed that perpetuation of the rule would do violence to the social conscience.

BENJAMIN N. CARDOZO, THE GROWTH OF THE LAW 136-137 (1924). At least thirty-eight of the forty-one states which have addressed the issue of whether a builder/vendor impliedly warrants habitability have ruled in favor of the warranty. Of the thirty-eight states embracing the warranty, only Maryland has done so through the legislative process. *See* Peter J. Shedd, *The Implied Warranty of Habitability: New Implications, New Applications,* 8 Real Estate L.J. 291, 303 (1980).

We agree with the virtual consensus among courts in our sister states that the implied warranty of habitability reflects a naturally expected and sound public policy. We accordingly recognize and adopt the warranty in this jurisdiction.

In the instant case, it is clear that Scott obtained the building permit under the designation of owner/builder, retained all contractor discounts, obtained workers' compensation insurance, paid the workers via the "Scott Construction Company" account and enjoyed "relaxed" construction regulations. It is equally clear that Scott did not lift a hammer nor did he have the knowledge or skill to participate in any material way in the actual construction of the house. Nevertheless, he enjoyed considerable managerial control. He was the owner/builder of the project who contracted with the unlicensed actual builder, Tonnemacher. We therefore conclude that the vendor/builder implied warranty of habitability applies to Scott, who assumed the identity as owner/builder/vendor of the house. Of course, Tonnemacher is also liable for breach of the implied covenant of habitability because of his status with Scott as a joint venturer.

Having carefully reviewed the record and arguments on appeal, we conclude that all remaining issues are without merit or need not be addressed given our disposition of this matter. We also conclude from the record that substantial evidence exists to fully support the district court's findings with respect to both liability and the amount of damages, and that it is unnecessary to discuss these issues other than to the extent previously addressed in this opinion.

### Conclusion

The district court properly determined that the contract

between Scott and Tonnemacher effectively formed a joint venture and that Radaker was entitled to a judgment for damages for the reasons discussed above. The lower court erred, however, in extending the apportionment of damages assessed against Scott and Tonnemacher *inter se* to Radaker.

Accordingly, we reverse and remand this action to the district court with instructions to amend the judgment to impose joint and several liability against Scott and Tonnemacher for all damages and costs awarded to Radaker.[2]

---

[2]THE HONORABLE CLIFF YOUNG, Justice, did not participate in the decision of this appeal.