ORDERED PUBLISHED

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | | |
|---|---|---|
| In re: | ) | BAP No. NC-12-1362-PaDJu |
| | ) | |
| WILLIAM ROGER UTNEHMER and | ) | Bk. No. 11-12159 |
| MARIE CLAIRE UTNEHMER, | ) | |
| | ) | Adv. No. 11-01239 |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| WILLIAM ROGER UTNEHMER; | ) | |
| MARIE CLAIRE UTNEHMER, | ) | |
| | ) | |
| Appellants, | ) | |
| vs. | ) | **O P I N I O N** |
| | ) | |
| PATRICK CRULL; MARY CRULL, | ) | |
| | ) | |
| Appellees. | ) | |

_____

Argued and Submitted on September 20, 2013
at San Francisco, California

Filed - October 10, 2013

Appeal from the United States Bankruptcy Court
for the Northern District of California

Hon. Alan Jaroslovsky, Chief Bankruptcy Judge, Presiding
_____

Appearances:    William Roger Utnehmer argued pro se.  Steven
Marc Olson argued for appellees Patrick and Mary
Crull.
_____

Before: PAPPAS, DUNN and JURY, Bankruptcy Judges.

PAPPAS, Bankruptcy Judge:

Chapter 7[1] debtors William Roger Utnehmer ("William")[2] and Marie Claire Utnehmer ("Marie" and together, "Debtors") appeal pro se[3] the judgment of the bankruptcy court awarding creditors Patrick ("Patrick") and Mary Crull (together, "Crulls") $100,000 plus interest, and determining that the judgment debt is excepted from discharge under § 523(a)(4). We REVERSE.

## FACTS

John Kwan ("John") and William did business as CW Development Partners ("CWDP"), a general partnership involved in real estate development in California. In February 2005, CWDP purchased a property in Venice, California (the "Property") for $1,250,000, which the partners intended to develop as a "spec house" by tearing down the existing structure and building a new luxury residence for resale. Title to the Property was taken in Debtors' individual names because John's credit was not as good as theirs. However, both William and John always considered the

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and "Rule" references are to the Federal Rules of Bankruptcy Procedure. Civil Rule references are to the Federal Rules of Civil Procedure.

[2] We refer to several of the parties by their first names for clarity; no disrespect is intended.

[3] While appearing pro se in this appeal, Debtors were represented in the bankruptcy court by counsel. The record indicates that William has in the past been a member of the California bar.

Property to be owned by CWDP.

Crulls were long-term acquaintances of John. Sometime in 2005, John offered Crulls "an opportunity to get in on this particular project." Trial Tr. 69:16-17, June 12, 2012. In June 2005, there was a telephone conversation between William and Patrick. The record is unclear as to who initiated the call and the specifics of the conversation. After the conversation, William sent Crulls a packet of documents, including the following:

1. A transmission letter addressed to Mary[4] Crull, indicating that a "cover letter, loan agreement/note and the private offering was attached."

2. A cover letter from William to Crulls. The letter contained the following statement: "Until the formal operating agreement is drafted and executed pursuant to the terms of the Private Offering, John and I will be executing promissory notes with you for the amount of your equity contribution."

3. A "Loan Agreement" proposing a $100,000 loan from Crulls to CWDP, including the following material terms:

   (A) The loan was to be for a term of not more than twelve months. The interest rate was twelve percent per annum, payable monthly. The entire balance of principal and interest was due upon sale of the property, or at the end of the twelfth month, whichever was sooner. The loan could be paid off at any time without any penalty for prepayment.

   (B) The loan was to be secured by a trust deed on the Property.

   (C) The loan proceeds were to be used by CWDP at

---

[4] In their dealings with one another, and in submissions to the courts, the parties occasionally refer to Marie as Mary.

-3-

their sole discretion.

(D) CWDP would procure liability, property and worker's compensation insurance as required, and name Lender [Crulls] as loss payee for an amount equal to the loan.

(E) The Parties agreed that $50,000 of the initial $100,000 loan was intended to be super[s]eded by execution of a formal operating agreement which would recharacterize this $50,000 of the lenders' interest as an investors' equity interest in a limited liability company to be formed, with a 10% annual preferred return, and 35% participation in profits on a prorated basis. The documents for formation of the limited liability company, and the operating agreement, were supposedly being drafted.

3. A promissory note ("Note") to be executed by William and John consistent with the Loan Agreement. However, the Note makes no reference to the Loan Agreement's provision for recharacterizing $50,000 of the money to be loaned as an equity interest at some later time.

4. A twelve-page "Private Offering," describing the Property and the investment opportunity.

On or about June 15, 2005, Crulls wire-transferred $100,000 to the CWDP Partnership Account at Bank of America. On June 15, 2005, William signed the Note evidencing the loan from Crulls.

William and John expected, and had informed Crulls of their intention, to complete the Property project within ten months. However, significant delays were experienced resulting from design changes. Over the next two years, Debtors obtained several additional loans to finance the construction project, which loans were secured, at least in part, by the Property.[5]

_____

[5] For example, in November 2005, Debtors borrowed $1.025 million from Bay Area Financial Corporation. In June 2006, Debtors borrowed another $200,000 from Bay Area Financial Corporation, secured in part by the Property. In the fall of
(continued...)

Patrick testified at trial that Crulls were never informed about these refinancings of the Property. Trial Tr. 71:13 ("We had no idea there was refinancings at all."). This is not disputed by Debtors.

The check ledger for the Property project reflects that $25,175.00 in interest payments were paid to Crulls from mid-2006 to mid-2008. Although the Loan Agreement with Crulls by its terms ended on June 15, 2007, the principal balance was not repaid.

By early 2008, the Property project had been completed. Crulls retained counsel to attempt to enforce their rights. On April 7, 2008, their attorney sent a letter to Debtors, confirming the parties' intention "to modify the [Loan] agreement." Those revisions provided that Debtors would pay Crulls $50,000 by April 28, 2008, plus $2,000 per month until the remaining balance due on the Note of $50,000 had been repaid. Notably, the modified terms of the parties' agreement included the following:

> When the Property sells, the remaining $50,000 principal sum of the Note shall be re-characterized as an investor's equity interest in the Property and the Crulls shall be paid first, their initial $50,000 equity, second 10% preferred return thereon, third their pro rata 35% share of the net sales proceeds.

[5](...continued) 2006, Debtors obtained a $2,083,000 construction loan from Anchor Loans for development of the Property. The loan cleared existing encumbrances against the Property, including a first and second deed of trust of Countrywide Mortgage held on the Property, and made a partial payment of the loans held by Bay Area Financial Corporation. In Summer 2007, Debtors borrowed another $110,000 from a Mr. Propp, using the Property in part as collateral. In Autumn 2007, Debtors refinanced the construction loan from Anchor Loans with a $2,550,000 loan from Loan Oak Fund.

William signed the modification, consenting to the revision of the Loan Agreement on April 8, 2008. Debtors made only one $4,000 payment on the obligations created in the revisions to the Loan Agreement.

In June 2008, the Property was sold for $3,725,000. All creditors on the Property project were paid in full from the proceeds, but no payment was made to Crulls. Crulls asserted that William informed them that he was unable to pay the debt from the proceeds of sale.

On September 30, 2009, Crulls filed a complaint against William in Los Angeles Superior Court, to collect the balance due on the Note. Crull v. Utnehmer, Case no. SC105077. When William did not respond, a default judgment was entered in favor of Crulls against him on June 28, 2010, in the amount of $213,645.17.

Debtors filed a chapter 7 bankruptcy petition on June 6, 2011. On their Schedule F and Statement of Financial Affairs, they listed a contingent, unliquidated, disputed debt owed to Crulls for $220,259.43 for the default judgment.

Crulls filed an adversary complaint against Debtors on September 12, 2011. In it, they requested that their claim against Debtors be excepted from discharge under § 523(a)(2) and (a)(6), alleging that William made numerous false statements on which they relied in connection with the Loan Agreement and to persuade them to refrain from objecting to the closure of escrow for the sale of the Property. Debtors answered the complaint on October 1, 2011, generally denying the allegations in the complaint.

A trial in the adversary proceeding was held on June 12, 2012. Early in the trial, the bankruptcy court indicated that it had read the parties' proposed findings of fact and conclusions of law that had been submitted earlier, and that it was not convinced that Crulls could establish any fraud or malice sufficient for exception to discharge under § 523(a)(2) or (a)(6). However, the court "saw that there may be liability under [§] 523(a)(4) . . . . if a partnership arrangement is shown." Trial Tr. 10:12-14.[6]

John, William and Patrick testified at the trial. At the close of testimony, the bankruptcy court repeated its conclusion that Crulls had not established that any fraud or malicious actions occurred to support an exception to discharge under § 523(a)(2) or (a)(6). Addressing Crulls' counsel, the court stated that "Your case, if at all, is based on your client's status as a partner . . . . If your client was a fiduciary in relation to the venture and cannot account for the proceeds, I think that that's enough to establish defalcation." Trial Tr. 78:3-5, 82:18-20.

The bankruptcy court took the issues under submission and, on June 18, 2012, entered a Memorandum after Trial. In it, the court dismissed Crulls' § 523(a)(2) and (a)(6) claims because

---

[6] Though Crulls at no time asked to amend their complaint, significantly, the parties offered no formal objection to the bankruptcy court proceeding with a trial on a claim for an exception to discharge under § 523(a)(4), even though a right to relief under this Code provision had not been pled in Crulls' complaint. They also do not cite the bankruptcy court's decision to adjudicate the issues based on this new theory as error on appeal. Accordingly, we, also, will examine the merits of the parties' arguments concerning that claim under § 523(a)(4).

there was no evidence to show fraud in the inducement, or willful and malicious conversion, by Debtors. Crulls have not appealed this aspect of the court's decision.

The bankruptcy court, however, made other factual findings regarding the original Loan Agreement:

> The parties memorialized their transaction in a "loan agreement." Under the terms of this agreement, the $100,000 was to be paid in full when the property was sold, or after 12 months, whichever came first. However, they also agreed that "$50,000 of this initial $100,000 is intended to be super[s]eded by execution of [a] formal operating agreement which will re-characterize $50,000 of the lender's interest to an investor's equity interest with a 10% annual preferred return and 35% participation in profits on the equity contribution on a prorated basis."

Based on these findings, the bankruptcy court concluded that Crulls were entitled to an exception to discharge under § 523(a)(4) because the Loan Agreement was:

> sufficient to make Utnehmer a partner of Crulls in the project. A partner has the responsibilities of a fiduciary within the meaning of § 523(a)(4) as to partnership property. Ragsdale v. Haller, 780 F.2d 794, 796-97 (9th Cir. 1986). Since Utnehmer took title to the project in his own name and refinanced several times without involving the Crulls, he has the burden of accounting for all of the proceeds as well as the costs and expenditures relating to the venture; failure to do so is defalcation, notwithstanding lack of demonstrated intent to harm or cheat his partners. In re Lewis, 97 F.3d 1182, 1186-87 (9th Cir. 1996). Utnehmer has not met his fiduciary duties. His accounting is not professional[ly] prepared and admittedly contains expenses not attributable to the partnership. He has not met his burden of showing that nothing is due to the Crulls.

On June 25, 2012, the bankruptcy court entered judgment for Crulls against William, and the community property interest of Marie,[7] for the $100,000 in principal owed under the Note, plus

---

[7] The bankruptcy court at trial had indicated its willingness to grant Debtors' request to dismiss Crulls' claims
(continued...)

interest from April 1, 2008. The judgment declared this debt excepted from discharge under § 523(a)(4).

Debtors filed a timely appeal on July 7, 2012.

**JURISDICTION**

The bankruptcy court had jurisdiction over this proceeding under 28 U.S.C. §§ 1334 and 157(b)(2)(I). We have jurisdiction under 28 U.S.C. § 158.

**ISSUES**

1.  Whether the bankruptcy court erred in determining that a partnership relationship existed between William and Crulls.

2.  Whether the bankruptcy court erred in determining that the debt owed by Debtors to Crulls was excepted from discharge pursuant to § 523(a)(4).

**STANDARDS OF REVIEW**

"In bankruptcy discharge appeals, the Panel reviews the bankruptcy court's findings of fact for clear error and conclusions of law de novo, and applies de novo review to 'mixed questions' of law and fact that require consideration of legal concepts and the exercise of judgment about the values that animate the legal principles." Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 28 (9th Cir. BAP 2009), aff'd 407 Fed. Appx. 176 (9th Cir. 2010), citing Wolkowitz v. Beverly (In re Beverly), 374 B.R. 221, 230 (9th Cir. BAP 2007), aff'd in part & dismissed in part, 551 Fed. Appx. 1092 (9th Cir. 2008), citing

---

⁷(...continued)
against Marie personally, but her interest in the community property could be liable for exception to discharge. Trial Tr. 6:21-24.

Murray v. Bammer (In re Bammer), 131 F.3d 788, 791-92 (9th Cir. 1997).

The bankruptcy court's determination that a partnership existed between the parties under California law was based on its interpretation of the Loan Agreement. A trial court's interpretation of the terms of a contract is reviewed de novo. Ameron Int'l Corp. v. Ins. Co. of State of Pa., 242 P.3d 1020, 1024 (Cal. 2010).

**DISCUSSION**

Applying California law to the facts of this case, we conclude that the bankruptcy court erred when it decided that a partnership existed between William and Crulls based upon the Loan Agreement. Since there was no partnership, William owed no fiduciary obligations to Crulls and, as a result, the bankruptcy court also erred in determining that William's debt to Crulls should be excepted from discharge as a defalcation by a fiduciary pursuant to § 523(a)(4). We therefore REVERSE.

The exception to discharge relied upon by the bankruptcy court, § 523(a)(4), provides that:

> (a) A discharge under section 727 [discharge in a chapter 7 case such as this one] . . . does not discharge any debtor from any debt — . . . (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]"

Case law makes clear that the broad, general definition of fiduciary - a relationship involving confidence, trust and good faith - is inapplicable in the context of exception to a bankruptcy discharge. Ragsdale v. Haller, 780 F.2d 794, 796 (9th Cir. 1986). Whether the debtor was acting in a fiduciary capacity within the meaning of § 523(a)(4) is a question of

-10-

federal law. Lewis v. Scott (In re Lewis), 97 F.3d 1182, 1185 (9th Cir. 1996). A debt is nondischargeable under § 523(a)(4) only "where (1) an express trust existed, (2) the debt was caused by fraud or defalcation, and (3) the debtor acted as a fiduciary to the creditor at the time the debt was created." Otto v. Niles (In re Niles), 106 F.3d 1456, 1459 (9th Cir. 1997). Thus, § 523(a)(4)'s exception to discharge results only where, among other things, the fiduciary relationship between the debtor and the creditor arises in relation to an express or technical trust that pre-dates the alleged defalcation. In re Lewis, 97 F.3d at 1185.

State law determines whether the requisite trust relationship exists. Id. Under California law, "all partners [are] trustees over the assets of the partnership." Ragsdale, 780 F.2d at 796; see CAL. CORP. CODE § 16404(b)(1) (partner has a duty to hold as trustee any "property, profit, or benefit derived" from partnership business or use of partnership property). Accordingly, "California partners are fiduciaries within the meaning of § 523(a)(4)." Ragsdale 780 F.2d at 796-97. Thus, the determination by a bankruptcy court that a partnership existed between William and the Crulls under California law would establish one important component of the proof required for an exception to discharge under § 523(a)(4).

However, even if a fiduciary relationship existed, the bankruptcy court must also find that William committed a "defalcation." As that term was understood in the Ninth Circuit at the time the bankruptcy court entered its judgment, a defalcation was a "misappropriation of trust funds or money held

-11-

in any fiduciary capacity; [the] failure to properly account for such funds." In re Lewis, 97 F.3d at 1186 (quoting BLACK'S LAW DICTIONARY 417 (6th ed. 1990)).

The court also ruled in Lewis that, for purposes of § 523(a)(4), a defalcation "includes the innocent default of a fiduciary who fails to account fully for money received. . . . In the context of section 523(a)(4), the term 'defalcation' includes innocent, as well as intentional or negligent defaults so as to reach the conduct of all fiduciaries who were short in their accounts." Id. at 1186 (internal citations ommitted). But in this respect, In re Lewis is no longer good law.

In May 2013, after the bankruptcy court entered its judgment, the United States Supreme Court decided Bullock v. BankChampaign, N.A., 133 S. Ct. 1754 (2013). Bullock effectively abrogated that part of In re Lewis holding that a debtor who failed to account to another need not possess any particular state of mind to except a debt from discharge based on fiduciary defalcation under § 523(a)(4). To the contrary, in Bullock, the Supreme Court interpreted § 523(a)(4) to require that, in order to except a debt for a defalcation by a fiduciary, the debtor must possess "a culpable state of mind . . . akin to that which accompanies application of the other terms in the same statutory phrase. We describe that state of mind as one involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." Id. at 1757.

Based upon the Supreme Court's holding in Bullock, the bankruptcy court erred when it concluded that William committed

-12-

a defalcation "notwithstanding [his] lack of demonstrated intent to harm or cheat his partners. In re Lewis, 97 F.3d [at 1186-87]." Memorandum after Trial at 3, June 16, 2012. As the Crulls acknowledged at oral argument, at a minimum, then, the bankruptcy court's judgment must be vacated and the matter remanded to the bankruptcy court to address the intent requirement for a defalcation under Bullock.

But there is a more consequential error in the bankruptcy court's decision which requires reversal, not merely remand. As discussed above, a bankruptcy court's determination that a California partnership was formed by the parties would ordinarily allow us to conclude that the requisite fiduciary relationship was established for § 523(a)(4) purposes. In this case, though, the bankruptcy court simply ruled, without explanation, that

> The court somewhat reluctantly agrees with the Crulls that there is liability under § 523(a)(4). The 'Loan Agreement' is sufficient to make Utnehmer a partner of the Crulls in the project. A partner has the responsibilities of a fiduciary within the meaning of § 523(a)(4) as to partnership property. Ragsdale v. Haller, 780 F.2d 794, 796-97 (9th Cir. 1986)).

Memorandum after Trial at 2.

We disagree that, without more, the Loan Agreement's terms were sufficient under California law to create a partnership agreement at the time the Loan Agreement was executed. We therefore must reverse the bankruptcy court's conclusions that a partnership existed based on the Loan Agreement and was effective at the time the Loan Agreement was signed.

In this appeal, Crulls argue strenuously that the bankruptcy court's decision that a partnership existed was a

-13-

finding of fact which may only be reversed for clear error, a highly deferential standard.[8]  While, as noted above, the bankruptcy court's decision construing the parties' contract is reviewed de novo, even if the clear error standard applied, it would not protect a finding based on "an erroneous view of the law."  Power v. Union P.R. Co., 655 F.2d 1380, 1382-83 (9th Cir. 1981) ("We may regard a finding of fact as clearly erroneous . . . if it was induced by an erroneous view of the law. . . . The question, then, is whether the [trial] court's findings and conclusions are based on a proper view of [] state law[.]").  Indeed, the Supreme Court has cautioned that the clear error rule is not a shield for a fact finding that is inconsistent with underlying law:

> But Rule 52(a) [applicable in bankruptcy adversary proceedings via Rule 7052] does not inhibit an appellate court's power to correct errors of law, including . . . a finding of fact that is predicated on a misunderstanding of the governing rule of law.

Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 501 (1984); see also, Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 855 n.15 (1982); United States v. Singer Mfg. Co., 374 U.S. 174, 194 n.9 (1963).

As we discuss below, the bankruptcy court's finding that there was a partnership established by the Loan Agreement was inconsistent with the governing law applicable in this case, the California law of partnerships.  Moreover, since at bottom we

---

[8]  At oral argument, William also seemed to agree that, based on the testimony at trial, the parties considered themselves partners at all times.  However, as reflected in its decision, the bankruptcy court's finding that a partnership existed was based solely on documentary evidence, and in particular the Loan Agreement, and not on testimony at trial.

-14-

are determining whether William's debt to Crulls should be discharged, we review the bankruptcy court's determination of that question as a mixed question of law and fact de novo and not as a simple fact determination for clear error. In re Weinberg, 410 B.R. at 28.

To determine whether the Loan Agreement established a partnership, its legal effect, we look first to the terms of the Loan Agreement as directed by the California courts. Kersch v. Taber, 67 Cal. App. 2d 499, 501 (Cal. Ct. App. 1945) ("The question of the existence of a partnership should be determined primarily by ascertaining the intention of the parties, and where they have entered into a written agreement such intention should be determined chiefly from the terms of the writing."). In examining the written agreement, we are obliged to follow a plain meaning analysis:

> The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the mutual intention of the parties. Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. Such intent is to be inferred, if possible, solely from the written provisions of the contract. The clear and explicit meaning of these provisions, interpreted in their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage, controls judicial interpretation. . . . An agreement is not ambiguous merely because the parties (or judges) disagree about its meaning. Taken in context, words still matter.

In re Installment Fee Cases, 211 Cal. App. 4th 1395, 1409 (Cal. Ct. App. 2013).

As noted above, the Loan Agreement is composed of five paragraphs. The first four paragraphs clearly reflect the terms

-15-

of what appears to be a loan of money from Crulls to CWDP; they make no reference to the creation or existence of a partnership between the parties. The only paragraph in the Loan Agreement that could arguably serve as the foundation of a partnership is paragraph 5, which provides:

> The Parties agree that $50,000 of this initial $100,000 loan is intended to be super[s]eded by execution of a formal operating agreement which will recharacterize $50,000 of the lender's interest to an investor's equity interest with a 10% annual preferred return and 35% participation in profits on the equity contribution on a prorated basis. Said operating agreement and formation of a Limited Liability Company is being drafted.

There can be no dispute about the plain meaning of this paragraph: it contemplates that, <u>at some future point in time</u> (i.e., upon the "execution of a formal operating agreement" for a yet-to-be formed limited liability company), a portion of the Crulls' loan would be "recharacterized" as an equity interest in the Property project entitling them, thereafter, to participate in the profits of the venture. There is nothing in the Loan Agreement to indicate any intent to form a partnership or LLC at the time of signing the Loan Agreement, nor at any point before the execution of the operating agreement or LLC formation. As we discuss below, this would be an essential element for defalcation under § 523(a)(4), because if the partnership was not in existence before any alleged wrongful behavior, there was no fiduciary duty and therefore there cannot be defalcation under § 523(a)(4).

Although the bankruptcy court's reasoning was perhaps not fully presented in its decision, we assume that the court relied upon the Loan Agreement's provisions for sharing profits by the

-16-

parties as an indication that the parties intended to form a partnership. But if this was the court's conclusion, it is inconsistent with the requirements of California law regarding formation of partnerships. Simply stated, "where the parties purport to establish a partnership to engage in business at a future time or upon the happening of a contingency, the partnership does not come into being until the time specified or until the contingency is removed." Solomont v. Polk Development Co., 245 Cal. App. 2d 488, 496 (Cal. Ct. App. 1966) [2d Dist.]; Kersch v. Taber, 67 Cal. App. 2d at 504 [3d Dist.]; Taylor v. Nelson, 26 Cal. App. 681, 682 (Cal. Ct. App. 1915) [1st Dist.]; accord Hollis v. Rock Creek Pack Station, 594 F. Supp. 156, 160 (D. Ariz. 1984) (applying California law: "where parties purport to establish a partnership to engage in business upon the happening of a contingency, the partnership does not come into being until the contingency has occurred."). We have located no California case law varying the rule that an agreement to form a partnership in the future, upon fulfillment of a contingency, does not, at the time of entry of the agreement, create a partnership.

In this case, if no partnership between William and Crulls was formed at the time they executed the Loan Agreement then, under California law, no fiduciary duty by William to Crulls arose at that time. If there was no partnership, no trust relationship existed between the parties, and no fiduciary duty was imposed upon William at the time of execution of the Loan Agreement. And any subsequent behavior, whether or not accompanied by bad intent, would not be a fiduciary breach

-17-

triggering exception to discharge under § 523(a)(4). <u>In re</u> <u>Lewis</u>, 97 F.3d at 1185 (holding that an express trust [i.e., a partnership] must exist before any defalcation).

Other concerns arise from the bankruptcy court's reasoning that a partnership arose from the Loan Agreement. As discussed above, the court apparently considered a future agreement to share profits as an indication of partnership. It is true that an agreement to share profits may be evidence of a partnership agreement. <u>Holmes v. Lerner</u>, 74 Cal. App. 4th 442, 453-54 (Cal. Ct. App. 1999); <u>Bank of Cal. v. Connolly</u>, 36 Cal. App. 3d 350, 364 (Cal. Ct. App. 1973). However, the presence of profit sharing does not support a presumption of the existence of the partnership unless there was also an actual sharing of the profits. CAL. CORP. CODE § 16202 (2013)("A person who <u>receives</u> a share of the profits of a business is presumed to be a partner in the business.")(emphasis added). Here, the facts are undisputed that no limited liability company was ever formed, no operating agreement was ever executed, and there was no actual sharing of profits between William and Crulls.

Moreover, profit-sharing is not considered the most important indicia of a partnership under California law. The existence of a partnership is ordinarily evidenced by some degree of participation by alleged partners in the management and control of the business. <u>Sperske v. Rosenberg</u>, 2013 WL 3817067, at *2 (C.D. Cal. 2013); <u>Fredianelli v. Jenkins</u>, 2013 WL 1087653 (N.D. Cal. 2013); <u>Dickinson v. Samples</u>, 104 Cal. App.2d 311, 315 (Cal. Ct. App. 1951) ("To participate to some extent in the management of a business is a primary element in partnership

-18-

organization, and it is virtually essential to a determination that such a relationship existed."). Here, the Loan Agreement grants Crulls no rights to participate in the management of the Property project, and in particular in paragraph 4, reserves the right to decide how the loan proceeds will be used solely to CWDP. Consistent with these terms, at trial, Patrick acknowledged that he was not consulted concerning management decisions, nor about the multimillion dollar financing arrangements made concerning the Property: "we had no idea there was refinancings at all." Trial Tr. 71:13.

Perhaps in recognition of the deficiencies in the bankruptcy court's conclusion concerning the existence of a partnership, on appeal, Crulls raise the alternative argument that because the Crulls detrimentally relied on William's promise to form a limited liability company, he should be estopped from denying the existence of such a promise. They urge that, under California law, since a manager of an LLC owes a fiduciary duty to members, we should hold that William was a fiduciary to Crulls when he "helped himself to millions of dollars from refinancing the partnership's Abbot Kinney property."

Our review of the record satisfies us that Crulls did not properly raise this argument in the bankruptcy court. An appellate court in this circuit will not consider arguments that "were not properly raised in the trial court." O'Rourke v. Seabord Sur. Co. (In re E.R. Fegert, Inc.), 887 F.2d 955, 957 (9th Cir. 1989); see also In re Cybernetic Servs., Inc., 252 F.3d 1039, 1045 n.3 (9th Cir. 2001) (stating that the appellate

-19-

court will not explore ramifications of an argument because it was not raised in the bankruptcy court and therefore waived).

Not only was the promissory estoppel argument not made in the bankruptcy court, Crulls have not properly raised it in this appeal. Crulls cite no authority for their argument that the manager of an LLC has the fiduciary duties as contemplated by § 523(a)(4) to other members of the LLC.[9] And in their brief, Crulls do not explain how a fiduciary duty that may arise in an LLC that does not come into existence until sometime in the future does not suffer from the same infirmity as a future partnership (i.e., defalcation under § 523(a)(4) requires the fiduciary duty to arise before any alleged wrongdoing takes place).

For these reasons, we conclude that the bankruptcy court erred in its determination that a partnership was formed by the Loan Agreement. At best, the parties agreed to form an LLC based upon events to occur in the future, events that never came to pass. Since no partnership existed between the parties during their dealings, we conclude that, as a matter of law, William was not a fiduciary as to Crulls for purposes of § 523(a)(4), and that the bankruptcy court erred in excepting the debt from discharge under that provision of the Bankruptcy Code.

---

[9] Even if this were so, since no LLC was ever formed and no operating agreement ever drafted, there is no evidence that William would be the managing member with a fiduciary duty to other members. Additionally, we observe that the Ragsdale rule that a California partnership implies the fiduciary duty for defalcation purposes under § 523(a)(4) only applies to a partnership. We have found no case law that applies the Ragsdale rule to a California LLC.

-20-

**CONCLUSION**

The bankruptcy court erred in ruling that it need not find that William acted with bad intent toward Crulls to conclude that the debt was excepted from discharge under § 523(a)(4). The Supreme Court's recent decision in <u>Bullock</u> overrules prior Ninth Circuit authority allowing such a conclusion. Therefore, at best, a remand to the bankruptcy court would be required to examine William's intent under the <u>Bullock</u> standard.

However, in this case, no remand is necessary because we conclude that the bankruptcy court erred when it decided that a partnership existed between Crulls and CWDP based on the Loan Agreement. Since no partnership was created, and no fiduciary duty existed, we REVERSE the decision of the bankruptcy court excepting William's debt to Crulls from discharge under § 523(a)(4).