**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | | |
|---|---|---|
| In re: | ) | BAP No.   CC-14-1065-SpDTa |
| | ) | |
| JOHN SHART and | ) | Bk. No.   2:10-bk-29973-B.R. |
| ELKE GORDON-SCHARDT, | ) | |
| | ) | Adv. No. 2:10-ap-02555-B.R. |
| Debtors. | ) | |
|_____| ) | |
| | ) | |
| WENDY HAIG; GREG SADLER; | ) | |
| SHOWCASE 81, LLC, | ) | |
| | ) | |
| Appellants, | ) | **MEMORANDUM**[1] |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN SHART; | ) | |
| ELKE GORDON-SCHARDT, | ) | |
| | ) | |
| Appellees. | ) | |
|_____| ) | |

Argued and Submitted on September 18, 2014
at Pasadena, California

Filed - November 19, 2014

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Barry Russell, Bankruptcy Judge, Presiding

_____

Appearances:     Jesse Sequoia Finlayson of Finlayson Toffer
Roosevelt & Lilly LLP argued for Appellants Wendy
Haig, Greg Sadler, and Showcase 81, LLC; Appellee
Elke Gordon-Schardt argued pro se.

_____

---

[1] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

Before:  SPRAKER[2], DUNN and TAYLOR, Bankruptcy Judges.

**INTRODUCTION**

This is Appellants' second appeal to this court on the issue of whether Elke Gordon Schardt ("Ms. Schardt") is liable for her husband, and co-debtor, John Shart's previously established fraud.  In the first appeal, this Panel upheld the bankruptcy court's determination that Ms. Schardt was not directly liable for fraud.  However, based on Tsurukawa v. Nikon Precision, Inc. (In re Tsurukawa), 287 B.R. 515 (9th Cir. BAP 2002) ("Tsurukawa II"), the Panel remanded the case for factual findings as to whether Ms. Schardt was a partner with, or agent of, her husband such that she would be vicariously liable for his fraudulent behavior for the purpose of excepting that debt from discharge under § 523(a)(2)(A).[3]

Appellants argued that Ms. Schardt's involvement in her husband's business warranted imputing his fraud to her.  The bankruptcy court disagreed, and concluded that she was simply acting as a wife who also happened to be an attorney.  In addition to finding that no partnership existed, the bankruptcy court held that there was no basis for imputing Mr. Shart's fraud to his wife for purposes of  nondischargeability under § 523(a)(2)(A).  Although Appellants argue otherwise, these findings are well supported by the record.  For these reasons, we

[2] Hon. Gary A. Spraker, Chief Bankruptcy Judge for the District of Alaska, sitting by designation.

[3] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

2

AFFIRM.

## I.  FACTUAL BACKGROUND

**A.   The Parties.**

Appellants Wendy Haig and Greg Sadler are married and live in Santa Fe, New Mexico.  Both had previously worked as certified public accountants.  With their six children, they were involved in riding, training, and showing high-end horses around the United States.  Ms. Haig, Mr. Sadler, and their children are the owners of Appellant Showcase 81, LLC, a New Mexico limited liability company that was formed in 2005 to hold title to the family's horses.

Debtors, John Shart and Elke Gordon Schardt, are a married couple.  Mr. Shart was in the business of buying, selling, trading, training, and boarding horses for more than 30 years. He is the 100% owner of Malibu Equestrian Estates, Inc. ("Malibu").  Malibu, doing business as Greystone Equestrian Center ("Greystone"), operated a horse-related business on an 85-acre parcel of real property located in Lynville, Tennessee, which is owned jointly by Mr. Shart and Ms. Schardt.  The Tennessee property (sometimes referred to herein as "the Farm") was purchased by the couple in 2004, and Mr. Shart moved his business there from Acton, California, in 2005.  Ms. Schardt, an attorney, continued to reside in California, where she has an active legal practice.  She would travel to the Farm infrequently, perhaps two to three times per year, to visit her husband.

**B.   The Evolution of the Haig/Shart Business Relationship.**

Between 2001 and 2003, Appellants operated their equestrian

3

activities out of four locations in New Mexico, including an equestrian center at Las Campañas, Santa Fe. Ms. Haig learned of Mr. Shart through the director at Las Campañas' equestrian center, and Mr. Shart facilitated Ms. Haig's purchase of several high quality horses. Because those horses were successful, in that they won several ribbons and championships, she purchased additional horses directly from Mr. Shart starting in 2004.

Ms. Haig continued to purchase horses from Mr. Shart, or Malibu, through 2008. Until early 2007, all of the purchased horses were boarded at facilities in New Mexico not affiliated with Mr. Shart or his business. A friendship developed between Ms. Haig and Mr. Shart, and she came to rely on him for advice regarding her horses and their training. They met socially, with Ms. Haig and her children occasionally staying at Greystone's facilities in Tennessee.

In 2006, Ms. Haig sent substantial sums of money to Mr. Shart for the purchase of horses, horse care fees, show fees, and other purposes. Because she had not received any bills from Mr. Shart up to this point, on or about November 22, 2006, Ms. Haig sent him a letter asking for clarification as to the purpose of payments she had made between May 2005 and September 2006. Her letter identified $1,849,000.00 in payments.

Ms. Haig received no response to this letter. In spite of this, she continued her business relationship with Mr. Shart. Sometime in February 2007, she and Mr. Shart attended a horse show in Gulfport, Mississippi. While there, Ms. Haig agreed to move the majority of her horses from New Mexico to Greystone in Tennessee, for boarding and training. Between March 2007 and

4

December 2008, Ms. Haig boarded on average twenty to twenty-five horses with Greystone. Unfortunately, the additional business only created further confusion regarding Ms. Haig's bills. She understood that her horses would be boarded for a flat fee of $50,000.00 per month, regardless of the actual number of horses boarded. This fee was to include board, feeding of all horses, and routine veterinary and farrier charges. Mr. Shart recalled that the arrangement was $2,000.00 monthly for board and training, per horse, plus veterinary and farrier charges. Charges for horse shows would be separate, and charged at the customary rates. The terms were never memorialized in a writing, and Ms. Haig would not receive a written bill until July 2008.

Despite the confusion surrounding the billings, Ms. Haig became increasingly more involved with Mr. Shart and Greystone. In 2007, she financed significant purchases for Greystone's use, again without providing written instructions or executing any written agreements with Mr. Shart.

### 1. **The Motor Homes.**

On or about January 23, 2007, Ms. Haig purchased two motor homes, paying $245,495.00 for the first ("Motor Home 1") and $240,973.00 for the second ("Motor Home 2"). Mr. Shart negotiated the purchases with the dealer. Title to Motor Home 1 was placed in Ms. Haig's name, but title to Motor Home 2 was placed in Mr. Shart's name. Ms. Haig explained that Mr. Shart had told her his existing motor home had mechanical problems and he needed a replacement to use while he was attending horse shows. She agreed to purchase the two motor homes for horse show use, "enabling everyone to stay on the show grounds during shows

5

- one for use by my family and one for [Mr. Shart] to use." Haig Decl. 12:6-8, Feb. 8, 2012, ECF No. 33. Ms. Haig would later claim that she instructed Mr. Shart to place title to both motor homes in her name. However, prior to making payment on Motor Home 2, Ms. Haig was provided with a copy of the Purchase Agreement for that vehicle, which identified the buyer as "John Shart." Mr. Shart contended this motor home was a gift to him from Ms. Haig.

**2. The Barn and the Flowers Land.**

Also in 2007, Mr. Shart constructed a barn on the Tennessee property to house some of Ms. Haig's horses ("the Barn"). The Barn is a bit of a misnomer as it included living quarters for Ms. Haig during her visits and four suites for grooms. The parties disputed who provided the funds for the Barn's construction. Ms. Haig also contended that Mr. Shart promised to construct the Barn as an incentive for her agreement to board horses with Greystone. She said Mr. Shart agreed that she could have a personal residence and her own barn at the Farm, which would belong to her and her family.

On May 10, 2007, Jerry and Beverly Flowers recorded a deed transferring a fourteen-acre parcel adjacent to the Tennessee property to Mr. Shart (the "Flowers Land"). Title was vested in Mr. Shart, but, again, the parties disputed who provided the funds for the purchase of the Flowers Land, and whether title should have been vested in Mr. Shart or Ms. Haig. Ms. Haig said Mr. Shart induced her to purchase this property because it would be valuable as additional pastureland for her horses. She wired $85,000.00 to Mr. Shart in May 2007 to cover the purchase price

6

of this property, plus closing costs. The bankruptcy court found this evidence to be the "smoking gun" with respect to Mr. Shart's fraud in this transaction. Trial Tr. 104:10-14, July 25, 2012.

### 3. The Kenworth Truck.

On September 14, 2007, Ms. Haig paid $162,250.43 for the purchase of a Kenworth truck. She explained that this purchase was necessary because Mr. Shart's health issues prevented him from driving the truck that he had been using to transport her horses to shows. She again relied on Mr. Shart to negotiate the purchase. She contends she instructed him to put title to the truck in the name of her husband, Mr. Sadler, but title to the truck was placed in the name of Greystone. Ms. Haig said she did not discover this until late 2008 or early 2009.

## C. Ms. Haig First Receives Billing Information in July 2008.

On July 10, 2008, Ms. Haig received a Federal Express ("FedEx") package containing three pages ("the 2005-2007 accounting"). The first page, titled "Accounting for Wendy Haig 2205[*sic*]-2007," was a summary that showed a lump sum total of $3,698,000.00 for monies wired from Ms. Haig, listed categories of expenses totaling $3,942,793.46, and reflected a balance owing of $244,793.47. The second and third pages simply listed "Wendy Haig's Horse Purchases" by date, price, and horse's name, between 2005 and 2007.

No other correspondence was included, but the handwritten airbill on the package listed Ms. Schardt as the sender, and included her California address. At trial, however, Ms. Schardt testified that she didn't recognize the handwriting on the airbill; it was not hers. She also testified that she did not

7

recall sending Ms. Haig the FedEx package.

Ms. Haig vehemently disagreed with this accounting. She believed Mr. Shart had been overcharging her on numerous matters, and was shocked to see any balance owing to Greystone. In July 2008, Ms. Haig also received detailed monthly bills covering January through June of 2008, in a separate mailing from Greystone's new bookkeeper, Susan Rhea. These bills, prepared by Ms. Rhea, reflected Mr. Shart's understanding that Greystone would bill Ms. Haig $2,000.00 monthly per horse, with veterinary and farrier expenses charged separately. Ms. Haig challenged the 2008 monthly billing statements as well, although she conceded corrections were ultimately made, "with argument and difficulty."

**D.    The Relationship Deteriorates and Ms. Schardt's Involvement.**

Throughout the remainder of 2008, Ms. Haig received monthly bills from Greystone. She contested many of them, and continued to press for a detailed accounting and reconciliation of the total amounts she had paid to Greystone. In turn, Mr. Shart demanded payment of the balance owed under the July 10, 2008 "accounting," and threatened to start selling Ms. Haig's horses to cover the balance.

The dispute reached its climax in December 2008, spilling over into early January 2009. During this period, Ms. Haig and Mr. Shart exchanged several letters regarding their dispute. In a letter dated December 4, 2008, Ms. Haig wrote "I . . . relinquish title to all horses at Greystone Equestrian Center, except Cincinnati," but declared that all other personal property, including the trucks and trailers, remained hers. Mr. Shart asserted that, on December 6, 2008, he left a letter in

8

Ms. Haig's room at the Barn accepting her offer, although he stated he would not return the truck and other personal property Ms. Haig mentioned in her offer. Ms. Haig denied ever receiving his response. On December 18, 2008, Mr. Shart sold two of Ms. Haig's horses over her objections.

The next day, Ms. Schardt arrived at the Farm for the holidays. Ms. Haig's attorney sent a letter to Mr. Shart that same day, requesting a comprehensive accounting, and directing him not to sell any more of Ms. Haig's horses. A week later, on December 26, 2008, Ms. Haig wrote a letter to Mr. Shart that itemized ten billing adjustments to be made in her favor. Her letter included a detailed spreadsheet listing Greystone's 2008 billings and credits, together with her proposed adjustments. According to her calculations, Ms. Haig had a credit balance of $137,508.90.

Ms. Schardt testified that "we were getting all these calls" during this time period. Trial Tr. 87:24-88:1, May 3, 2012. She asked both her husband and Greystone's bookkeeper, Ms. Rhea, about the correspondence and what was going on. Ms. Rhea had been working on an accounting of Ms. Haig's transactions for some time when Ms. Schardt arrived. With the bookkeeper, Ms. Schardt reviewed all the wire transfers referenced in Ms. Haig's letter of December 26, 2008, and wrote notes on her copy of the letter. In the course of this review, they discovered one wire transfer that had not been credited to Ms. Haig.

Ms. Schardt also testified that Ms. Rhea complained to her that Ms. Haig was constantly disputing and requesting changes to Greystone's bills. The bookkeeper told her that Ms. Haig had

9

asked for so many changes it had gotten to the point where she was confused and did not know what was right anymore. Ms. Schardt reminded her that Ms. Haig was a client, and recommended that she just complete the accounting. If Ms. Haig responded that a credit was due, then the bookkeeper could compare and, if needed, make corrections to the account. This recommendation was based on how Ms. Schardt handled her own business accounts.

Mr. Shart sent four letters to Ms. Haig in early January 2009.[4] The first, dated January 1, 2009, responded to Ms. Haig's December 26, 2008 correspondence. Mr. Shart acknowledged that one wire transfer, for $25,000.00, had been missed and would be credited to Ms. Haig's account. The letter also provided Mr. Shart's explanation as to other disputed items. On January 5, 2009, Ms. Haig received a revised accounting, titled "Wendy Haig Accounting" (the "2008 accounting"). The spreadsheet showed a beginning balance due of $244,793.47, and detailed the monthly billings, payments, sales of horses, and miscellaneous credits in 2008. This accounting showed a final balance of $134,737.56 as of the end of December 2008. Ms. Haig responded that same day, and again on January 6, 2009, by faxing additional information to Mr. Shart in an attempt to establish further credits in her favor that were not reflected in the 2008 accounting.

The same day that her initial response to the 2008

---

[4] The copies of the letters dated January 2 and 4, 2009, are virtually illegible.

10

accounting was sent, on January 6, 2009, Mr. Shart wrote another letter to Ms. Haig in which he stated that she was already "in possession of our accounting up to December 31, 2008, and may present [her] own accounting for comparison." The letter also complained about Ms. Haig's "continuous and completely uncalled for telephone harassment" during the past couple of days.

Ms. Schardt was still visiting the Farm when these letters were sent. She testified that she reviewed her husband's letters for grammatical and typographical errors because his English wasn't "exactly stellar" and he often dictated half in German and half in English. Trial Tr. 99:13-18, May 3, 2012. As a result, someone always proof-read Mr. Shart's letters. Nonetheless, Ms. Schardt was adamant that she did not make substantive changes to any of the letters.

Given the parties' escalating disagreements, on January 7–9, 2009, Ms. Haig, Mr. Sadler, and Mr. Sharp, an assistant of Ms. Haig's, traveled to Tennessee to pick up the remaining horses. Mr. Shart demanded payment for the outstanding balances before he would agree to release the horses. Ms. Haig contends Mr. Shart "specifically told her," during this visit, that Ms. Schardt had advised him to demand payment of $250,000.00 from her before releasing the horses. Haig Decl. 31:20-21. However, Mr. Sadler stated that Ms. Haig was so upset during this visit that she did not even speak to Mr. Shart. Sadler Decl. 4:21-23, Feb. 8, 2012, ECF No. 35.

Mr. Sadler and Mr. Sharp met Mr. Shart at the Farm on January 8, 2009. Mr. Sharp recalled that Mr. Shart told him he would release the horses if Ms. Haig paid her debt to him, which

11

he claimed was in excess of $200,000.00. He did not say that this demand was suggested by Ms. Schardt. Mr. Sadler and Mr. Sharp both stated, however, that during this visit Mr. Shart told them that Ms. Schardt had been involved in reviewing the billings or accountings. Unable to resolve the matter, Mr. Shart refused to allow Ms. Haig to recover her horses.

These events left Ms. Schardt with a "gut feeling" that litigation might be around the corner. Trial Tr. 90:21-23, May 3, 2012. Sometime in late December 2008 or early January 2009, she may have suggested to her husband that he consult with an attorney, and may have looked into finding an attorney with expertise in the equine area. Ms. Schardt also spoke to the attorney that Mr. Shart retained with respect to Appellants' dispute, although it is not clear from the record whether this occurred before or after the attorney's retention by Mr. Shart. This same attorney would also initially represent Ms. Schardt in the civil action that Appellants filed against both Debtors and Mr. Shart's business, Malibu.

**E.    The State Court Litigation.**

On February 9, 2009, Appellants sued Mr. Shart, Ms. Schardt, and Malibu in state court. Haig v. Shart, dkt. no. 4394 (Chancery Ct., Giles Cnty., Tennessee, February 9, 2009). The complaint alleged that Mr. Shart and Malibu had made multiple misrepresentations to Ms. Haig regarding the acquisition and sale of horses and that there were disputed expenses charged for trade shows, construction costs, real estate, personal property acquisitions, and other matters. Notably, the complaint focused on the actions of Mr. Shart, and only sought recovery against

12

Ms. Schardt for "unjust enrichment."

A month later, on March 2, 2009, the Tennessee Chancery Court entered an Agreed Temporary Injunction that prohibited Mr. Shart and Ms. Schardt from selling any additional horses or personal property owned by Appellants, including the Kenworth truck. It also required Appellants to grant Mr. Shart and Mrs. Schardt a security interest in one of the horses to secure the claims for outstanding boarding and training services.

At the time this injunction was drafted, Mr. Shart and Ms. Schardt were both represented by the same attorney. Ms. Schardt testified that she was personally involved in the negotiations regarding the injunction. She explained that, as a practicing attorney, she knew about injunctions, and she discussed with their counsel her specific ideas as to what kind of language should be in it.

Ms. Haig's representatives returned to the Farm on March 5, 2009, to remove Appellants' remaining horses and personal property. They were permitted to remove eleven horses and some other items of property. Ms. Schardt was present at the Farm on this date, but there is no evidence that she was involved in the return of assets to Ms. Haig or interacted with Ms. Haig's representatives during this visit. Roughly two weeks later, on March 23, 2009, Mr. Shart and Ms. Schardt's counsel substituted out of the state court action and Mr. Shart and Ms. Schardt each retained independent counsel.

By April 2009, Appellants had determined that at least five of their horses were still stabled with Greystone. The state court entered an order granting Appellants possession of the

13

horses, their request for injunctive relief, and authorization to inspect Greystone's premises. The bankruptcy court ultimately found that Appellants never recovered seven of their horses.

On May 22, 2009, Appellants amended their complaint in the Tennessee Chancery Court and also sent letters to individuals who had purchased some of Appellants' horses from Mr. Shart. In response, Ms. Schardt mailed a letter dated June 2, 2009, to four individuals, including a Ms. Filipovitch, concerning the ongoing litigation.[5] Ms. Schardt testified that she sent these letters because people were calling and asking about the litigation. Although written on Greystone's letterhead, Ms. Schardt identified herself in the letter as Mr. Shart's wife, and signed it individually. She also clarified that "I own the farm together with [Mr. Shart], but have no involvement in the horse business; yet am being sued for unjust enrichment." She described Appellants' suit as a "personal vendetta" against her husband, and enclosed a copy of Mr. Shart's amended answer and counterclaim, which sought damages against Appellants for breach of contract, pasturage and livery stable liens, a declaratory judgment, libel, slander, intentional interference with business relationships, and other counts.

In November 2009, Mr. Shart sold the Kenworth truck to MHC Kenworth for $80,000. Ms. Haig's counsel obtained information about the sale in February 2010, and contacted Mr. Shart's counsel for details. Mr. Shart's counsel sent an

[5] Only the letter to Ms. Filipovitch is included in the record, suggesting that the same letter was sent to each of the four recipients.

14

email to Ms. Schardt inquiring about the truck. When Ms. Schardt received this email, she was aware that her husband was attending a horse show in Gulfport, where cell phone reception was very poor. She replied by email to Mr. Shart's attorney that:

> Hans owns more than one Kenworth. I note with curiosity the claim that W bought the truck and it is titled in Hans [sic] name. You may recall she gave it to him, and there is a dispute. I cannot reach Hans, therefore no answer. Stall her, and find out what truck, who said it was sold and where is it? In my humble opinion the injunction is not worth the paper it is written on. The judge basically said so himself last time we tried to enforce its terms. All I am asking is that as Hans [sic] counsel you cover his back until he is back from the horseshow. He has to make a living.

Ms. Schardt testified that, after sending this response, she did nothing further with respect to the truck. She was in California and assumed Mr. Shart's attorney in Tennessee would follow up on the matter. She also testified that she was not involved in the drafting of a subsequent letter Mr. Shart's counsel sent to Ms. Haig's counsel about the truck. This letter threatened sanctions and stated that Mr. Shart had not sold the truck.

## II. PROCEDURAL HISTORY

**A.    The Bankruptcy and the Original Adversary Action.**

Mr. Shart and Ms. Schardt filed a chapter 11 petition in the Central District of California on May 18, 2010. On their Schedule A, they indicated that they owned the Barn and the

15

Flowers Land.[6]  Their Schedule F listed a disputed, contingent, and unliquidated debt to Appellants for $1 million.  On September 21, 2010, the bankruptcy court converted Debtors' case to chapter 7, and a trustee was appointed.

Appellants filed a proof of claim in the bankruptcy case on January 21, 2011, in the amount of $2,600,000.00.  Debtors objected to the claim, arguing that they did not owe the money.  On August 23, 2010, Appellants filed the underlying adversary proceeding against Debtors.  As amended, Appellants' complaint alleged that Debtors made misrepresentations with the intent of deceiving them into paying $1.1 million to construct the Barn and purchase the Flowers Land, among other things, and that this debt should be excepted from discharge under § 523(a)(2)(A).  The complaint further alleged that Debtors had engaged in fraud or defalcation as fiduciaries related to the $1.1 million, and that the debt should be excepted from discharge under § 523(a)(4).  Finally, the complaint asserted that Debtors willfully, maliciously, and intentionally injured Appellants and converted their property, and the resulting debt should be excepted from discharge under § 523(a)(6).  In an answer filed on April 6, 2011, Debtors generally denied these allegations.

The adversary trial was consolidated with Debtors' claim objection and tried over five days in April, May, and July 2012.  The bankruptcy court issued an oral ruling on July 25, 2012.  It held that Mr. Shart had engaged in fraud and that his credibility

---

[6] Appellants assert Debtors also scheduled Motor Home 2 as one of their assets.  The Schedules themselves are not in the record.

16

was "quite frankly, zero." Trial Tr. 101:14-15, Jul. 25, 2012. Appellants' claim was allowed in the sum of $1,817,104.19, as a community claim under § 524(a)(3). However, the bankruptcy court did not except the entire claim from discharge. Damages for an initial group of 11 horses and costs allegedly incurred by Appellants for the construction of the Barn were allowed as part of Appellants' claim but not excepted from discharge. The following four components of Appellants' allowed claim, totaling $860,726.43, were found to be nondischargeable as against Mr. Shart:

    a) $372,503.00 attributable to "the second group of horses,"

    b) $85,000.00 for the Flowers Land,

    c) $162,250.43 for the Kenworth truck, and

    d) $240,973.00 for Motor Home 2 that had been titled in Mr. Shart's name.[7]

    As to Ms. Schardt, the court found that none of Appellants' claims would be excepted from discharge. It noted that her involvement was limited to "helping with emails and things," and "cleanup at the end," rather than assisting with the actual transactions that were the basis for Appellants' claims. Focusing on the issue of imputation of fraud, the court noted its disagreement with Tsurukawa II stating, "I think even the BAP got it wrong." Trial Tr. 100:4-8, Jul. 25, 2012. The court found that any involvement Ms. Schardt had in the parties' dispute was as a spouse and refused to impute liability for her husband's

[7] The parties do not dispute the calculation of damages on appeal.

17

fraud.

In September 2012, the bankruptcy court entered a judgment in favor of Appellants, and against Mr. Shart, for $860,726.43, with this sum being excepted from discharge under § 523.[8] The judgment further stated that Appellants' claims against Ms. Schardt were discharged. Appellants appealed the discharge of their claims against Ms. Schardt, but only as to the $860,726.43 excepted from discharge as against Mr. Shart.

**B.    The First Appeal to the BAP ("Shart I").**

In the first appeal (Haig v. Shart (In re Shart), 2013 WL 1397401 (9th Cir. BAP Apr. 2, 2013)("Shart I")), the Panel affirmed the bankruptcy court's determination that Ms. Schardt was not directly liable for fraud. It specifically referenced Ms. Haig's testimony that Ms. Schardt had never made a false representation to her about the financial issues in question. Id. at *5. Based on this evidence, the Panel upheld the bankruptcy court's determination that Ms. Schardt did not have any involvement with the actual transactions that were the basis for Appellants' claims. Id. at *5-6.

Although the Panel affirmed the denial of Ms. Schardt's direct liability for fraud, it vacated the lower court's ruling as to "imputed liability." Though it noted that marriage alone was an insufficient basis to impute fraud, under Tsurukawa II, "imputation of liability was possible in a § 523(a)(2)(A)

---

[8] As the Panel noted in the first appeal, the judgment does not identify the applicable subsections of § 523(a). Haig v. Shart (In re Shart), 2013 WL 1397401 at *4 (9th Cir. BAP Apr. 2, 2013). On appeal, Appellants have exclusively relied upon § 523(a)(2)(A).

18

proceeding where the court finds a partnership or agency relationship existed between the spouses." Id. at *6. The Panel vacated and remanded the case because the bankruptcy court's findings on these issues were inadequate for review. It directed the bankruptcy court to consider certain items culled from the record, that might support the existence of a partnership or agency relationship between Debtors; specifically, that Ms. Schardt may have: (1) prepared and mailed allegedly fraudulent accounting statements to Ms. Haig; (2) maintained one bank account and check register for Mr. Shart's business and assisted in preparation of tax returns; (3) made handwritten notes on billing disputes with Appellants and forwarded them to Mr. Shart; (4) reviewed and edited Mr. Shart's responses to the billing disputes; (5) directed her bookkeeper to ignore Ms. Haig's complaints about her bills; (6) provided advice to Mr. Shart in his negotiations with Ms. Haig; (7) prepared some of the bills sent to Ms. Haig; and (8) signed letters on Greystone letterhead relating to Greystone business matters. Shart I, 2013 WL 1397401 at *8.

The Panel recognized that the bankruptcy court may have considered this evidence, but it could not know based on the record. It remanded the action for more specific findings on "whether [Ms. Schardt] was involved in a partnership or agency relationship with Mr. Shart such that his fraudulent behavior should be imputed to Ms. Schardt for the purposes of exception to discharge under § 523(a)(2)(A) as set forth in [Tsurukawa v. Nikon Precision, Inc. (In re Tsurukawa), 258 B.R. 192 (9th Cir.

19

BAP: 2001)(']  Tsurukawa I[')] and Tsurukawa II."  Id. at *9.

**C.    The Bankruptcy Court's Decision on Remand.**

On remand, the bankruptcy court incorporated the Panel's statement of facts from the first appeal.  Haig v. Shart (In re Shart), 505 B.R. 13, 21-24 (Bankr. C.D. Cal. 2014). Neither party disputes those underlying facts, and, specifically, Mr. Shart's liability for fraud.  The court held that, even if Ms. Schardt "magically became the partner of her husband in 2009, she was clearly not his partner when the fraud occurred in 2007." Id. at 28.  It found that Mr. Shart's fraudulent conduct occurred in 2007, and Ms. Schardt's involvement with her husband's activities did not begin until 2009, well after the fraudulent activities had occurred.  The bankruptcy court also addressed the eight items noted by the Panel, but found the evidence to be insufficient to establish the existence of a partnership or an agency relationship.  Id. at 26-27.  After such review, the court again concluded that "Ms. Schardt simply acted as a spouse who happened to be an attorney and helped out her husband."  Id. at 26.  Based upon this conclusion, the bankruptcy court held that the fraud of Mr. Shart could not be imputed to Ms. Schardt under § 523(a)(2)(A).  Shart, 505 B.R. at 27.

Appellants filed the instant appeal on February 12, 2014.

**D.    The Panel's Subsequent Decision in Huh.**

Shortly after the instant appeal was filed, the Panel issued its en banc decision in Sachan v. Huh (In re Huh), 506 B.R. 257 (9th Cir. BAP 2014).  There, a creditor sought to impute the fraud of a real estate agent to his principal for purposes of excepting the debt from discharge under § 523(a)(2)(A).  In a

20

prepetition state court action, the debtor had been found vicariously liable, as a principal, for his agent's wrongdoing. The debtor defended the discharge claims on the basis that he did not know, or have reason to know, of his agent's fraud. The Panel reexamined Tsurukawa II and other governing precedent on imputing fraud in discharge actions in light of the Supreme Court's decision in Bullock v. BankChampaign, N.A., __ U.S. __, 133 S.Ct. 1754, 185 L.Ed.2d 922 (2013).

Upon review, the Panel clarified Tsurukawa II's imputation analysis to hold that fraud may not be imputed solely based on the existence of a partnership or agency relationship. "While the principal/debtor need not have participated actively in the fraud for the creditor to obtain an exception to discharge, the creditor must show that the debtor knew, or should have known, of the agent's fraud." Huh, 506 B.R. at 271-72. Thus, under Huh, if a partnership or agency relationship is found, the debtor's culpability must then be evaluated to determine whether fraud may be imputed for purposes of exceptions to discharge.

On May 22, 2014, this Panel directed the parties to supplement their briefs to analyze the holding of Huh. Appellants and Ms. Schardt submitted supplemental briefs, and Appellants also supplemented the record, to address this change in the law. Appellants have requested that the case again be remanded for further proceedings in light of Huh.

### III. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(I). This court has jurisdiction under 28 U.S.C. § 158.

21

## IV.  ISSUES

1.  Did the bankruptcy court err in finding that no partnership or agency relationship existed between Debtors, such that there was no basis to establish Ms. Schardt's liability for Mr. Shart's fraudulent conduct.

2.  Did the bankruptcy court err in failing to impute Mr. Shart's fraud to Ms. Schardt for purposes of § 523(a)(2)(A).

## V.  STANDARDS OF REVIEW

Whether a claim is excepted from discharge under § 523(a)(2)(A) presents mixed issues of law and fact which we review de novo. Diamond v. Kolcum (In re Diamond), 285 F.3d 822, 826 (9th Cir. 2002). "De novo means review is independent, with no deference given to the trial court's conclusion." Mwangi v. Wells Fargo Bank, N.A. (In re Mwangi), 432 B.R. 812, 818 (9th Cir. BAP 2010); see also First Ave. W. Bldg., LLC v. James (In re OneCast Media, Inc.), 439 F.3d 558, 561 (9th Cir. 2006).

We review the bankruptcy court's findings of fact for clear error. Honkanen v. Hopper (In re Honkanen), 446 B.R. 373, 378 (9th Cir. BAP 2011). "The clear error standard is significantly deferential and is not met unless the reviewing court is left with a 'definite and firm conviction that a mistake has been committed.'" Fisher v. Tucson Unified School Dist., 652 F.3d 1131, 1135 (9th Cir. 2011)(citation omitted). There is no clear error unless the findings of fact are "'(1) illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009)(en banc)(quoting Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 577

22

(1985)). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Lewis v. Ayers, 681 F.3d 992, 999 (9th Cir. 2012)

The bankruptcy court's credibility determinations are entitled to special deference. Leon v. IDX Systems Corp., 464 F.3d 951, 958 (9th Cir. 2006)(citation omitted). Deference is given to the trial judge in this area, "for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Anderson v. City of Bessemer City, N.C., 470 U.S. at 575.

This court may affirm on any ground supported by the record. Shanks v. Dressel, 540 F.3d 1082, 1086 (9th Cir. 2008)(citing Atel Fin. Corp. v. Quaker Coal Co., 321 F.3d 924, 926 (9th Cir. 2003)(per curiam)).

## VI.  DISCUSSION

In a nondischargeability action under § 523(a), the creditor has the burden of proving all the elements of its claim by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291 (1991). Exceptions to discharge are strictly construed against an objecting creditor and in favor of the debtor to effectuate the fresh start policies under the Bankruptcy Code. Snoke v. Riso (In re Riso), 978 F.2d 1151, 1154 (9th Cir. 1992).

Debts for money or property are excepted from discharge "to the extent obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). In Shart I, the Panel affirmed the bankruptcy court's ruling that Ms. Schardt had not made false representations or engaged in actual fraud with

23

respect to Appellants. In this second appeal, Appellants seek to impute Mr. Shart's fraud to Ms. Schardt. They must establish, first, that Ms. Schardt was a partner in her husband's horse business, so that she is vicariously liable for her husband's fraud.[9] Tsurukawa II, 287 B.R. at 527. If a partnership is found to exist, Ms. Schardt's culpability with respect to the fraudulent transactions would then be evaluated under the "knew or should have known" standard of Huh.[10]

Appellants contend Ms. Schardt became her husband's business partner through her active involvement in his business. Given her involvement in the business, they argue that she knew, or should have known, of his fraudulent activities, and must be charged with his fraud for purposes of excepting her partnership liability to Appellants from discharge under § 523(a)(2)(A).

**A.   To Establish a Partnership, California Law Requires Evidence that Ms. Schardt was a Co-Owner with a Right to Participate in the Management of Her Husband's Business.**

The existence of a partnership is a question of fact governed by state law. Tsurukawa II, 287 B.R. at 521. In this instance, California law applies. Shart I, 2013 WL 1397401

---

[9] This case was specifically remanded for factual findings as to whether Ms. Schardt was either a partner in her husband's business or an agent. On remand, the parties' focus, and the court's examination, was directed to whether Ms. Schardt had entered into a business partnership with her husband, to the exclusion of any argument that an agency relationship existed. Appellants do not argue on appeal that an agency relationship existed. As such, this Panel limits its examination to whether a business partnership existed between the spouses.

[10] This two-step analysis was unnecessary in Huh because the debtor/broker had previously been found vicariously liable for the acts of his agent. Huh, 506 B.R. at 261.

24

at *8.  California law defines a partnership as "the association of two or more persons to carry on as co-owners a business for profit."  Cal. Corp. Code § 16202(a)(2014).  "In California, the burden of proving a partnership is on the party alleging it." In re Lona, 393 B.R. 1, 11 (Bankr. N.D. Cal. 2008)(citing Mercaco v. Hoefler, 190 Cal.App.2d 12, 16 (Cal. Dist. Ct. App. 1961)). Appellants seize upon statements made in Tsurukawa II, and repeated in Shart I, that "[a] business partnership between a debtor and spouse for denial of discharge purposes exists where 'the debtor assumed an active role in the [spouse's business] that goes beyond merely holding a community property interest in [the spouse's] business and performing minor services in that business.'"  Shart I, 2013 WL 1397401 at *8 (citing Tsurukawa II, 287 B.R. at 521).  However, both cases recognized that more than mere involvement in a spouse's business is required to establish a partnership.

Whether parties have created a partnership "depends on whether they intended to share in the profits, losses and the management and control of the enterprise."  Shart I, 2013 WL 1397401 at *8 (citing Bank of Cal. v. Connolly, 36 Cal.App.3d 350, 364 (Cal. Ct. App. 1973); Nelson v. Abraham, 29 Cal.2d 745, 749-50 (Cal. 1947)).  Co-ownership and profit-sharing are strong evidence of a partnership.  Tsurukawa II, 287 B.R. at 521 (citing Holmes v. Lerner, 74 Cal.App.4th 442, 453-54 (Cal. Ct. App. 1999)).  But, "profit sharing is not considered the most important indicia of a partnership under California law." Utnehmer v. Crull (In re Utnehmer), 499 B.R. 705, 716 (9th Cir. BAP 2013).  Additionally, "[j]oint tenancy, tenancy in common,

25

tenancy by the entireties, [or] joint property . . . does not by itself establish a partnership, even if the co-owners share profits made by the use of the property." Cal. Corp. Code § 16202(c)(1). Rather, it is essential that there be a right of joint participation in management and control of the business. Bank of Cal. v. Connolly, 36 Cal.App.3d at 364; Utnehmer, 499 B.R. at 716 (participation in management of the business is a primary element of partnership, and essential to the determination of whether a partnership exists). The right to participate in management, rather than the actual exercise of such right, is determinative of the relationship. Tsurukawa II, 287 B.R. at 522 (citing Singleton v. Fuller, 118 Cal.App.2d 733, 740-41 (Cal. Dist. Ct. App. 1953)).

Both the parties, and the court in Shart I, rely upon Tsurukawa II for guidance as to the quantum of evidence necessary to establish a business partnership between husband and wife. The Tsurukawa II Panel applied the same body of California law to affirm the bankruptcy court's conclusion that a business partnership existed. In Tsurukawa II, the husband funneled repairs required by his employer, Nikon Precision, Inc., to a company set up in his wife's name. Rather than do the work, the husband would have third parties repair the equipment, then have his wife's company overbill his employer. The debtor, Mrs. Tsurukawa, was involved in this business from the beginning. She contributed the initial capital for the business, signed and filed a fictitious business name statement as sole owner of the business, opened a business bank account as sole signatory, applied for and used a corporate credit card, identified herself

26

as sole owner on the business tax returns, signed the lease for business space, and arranged for utility service and repairs to the business premises.  Tsurukawa II, 287 B.R. at 523-24. Additionally, Mrs. Tsurukawa signed "hundreds of checks," including checks to herself exceeding $100,000.  Id. at 523.  She also used the proceeds from the business "to dramatically improve [her] standard of living, including the purchase of two additional houses, for approximately $870,000, and three cars." Id. at 524.  Despite these facts, Mrs. Tsurukawa was found to have no actual intent to defraud the creditor.  Id. at 520.

In examining whether a partnership existed between the spouses, the Tsurukawa II Panel reiterated the bankruptcy court's admonition that "[t]he assumption of [business functions] by a spouse may not carry the weight that such conduct on the part of a stranger would imply."  Tsurukawa II, 287 B.R. at 522 (internal citation omitted).  Yet, the evidence of a partnership was "overwhelming."  Id. at 524.  The court rejected Mrs. Tsurukawa's argument that no partnership existed because she did not control the business or participate in its day to day operations.  As the owner of the company, she held the right to its management and control, whether she exercised that right or not.  Id. at 522.

**B.    The Bankruptcy Court Correctly Found No Partnership Existed.**

On remand in this case, the bankruptcy court examined each of the items identified in Shart I as possibly probative of a partnership between Ms. Schardt and her husband.  Taken individually or together, the bankruptcy court found them insufficient to establish a partnership.

Appellants contend the bankruptcy court clearly erred

27

because it: (1) failed to properly account for each of the eight items identified in Shart I, (2) inaccurately found that Ms. Schardt's involvement in Greystone did not begin until 2009, and (3) ignored Ms. Schardt's "pre-litigation" declaration. Ms. Schardt responds that any involvement she had with her husband's business never rose to the level necessary to create a partnership and that Appellants' disagreement with the bankruptcy court's factual findings does not make them clearly erroneous as they are supported by the record. We agree.

**1. The Bankruptcy Court's Findings as to the Items Identified in Shart I.**[11]

**a) Ms. Schardt's Involvement in the Preparation of Accountings and Billings.**

In Shart I, the Panel noted that there was some evidence Ms. Schardt prepared and mailed allegedly fraudulent accounting statements, as well as some bills, to Ms. Haig. Shart I, 2013 WL 1397401 at *8. On remand, the bankruptcy court recognized that Ms. Schardt had sent the FedEx package containing the 2005-2007 accounting to Ms. Haig in July 2008, but found that there was no evidence she prepared the enclosed documents. Shart, 505 B.R. at 26. Similarly, it concluded that "there was simply no evidence that proves that Ms. Schardt prepared some of the bills." Id. In neither instance did the bankruptcy court address the testimony of Mr. Sharp, or Mr. Sadler, regarding

---

[11] Although the Panel listed eight items that might be probative of a partnership, and the bankruptcy court specifically addressed each one, the same underlying evidence overlaps several of these items. For this reason, we have combined the discussion of those items, where appropriate, in light of the evidence in the record.

28

Mr. Shart's statement to them, on January 8, 2009, that his wife had worked on Greystone's billings or accountings. Appellants contend that this testimony, taken together with the FedEx package, establishes Ms. Schardt's active, ongoing involvement in Greystone's business. They also argue that her preparation of these accountings and billings demonstrates knowledge of her husband's fraudulent activities.

Appellants improperly conflate these separate events – a FedEx package sent in July 2008 and hearsay testimony regarding a conversation in January 2009 – to support their arguments. But, Mr. Sharp's and Mr. Sadler's testimony is vague as to what type of document Mr. Shart said his wife prepared. In his trial declaration, Mr. Sharp recalled "a lengthy discourse [by Mr. Shart] about the bills sent to Wendy and all the work it had taken his wife, Elke Gordon Schardt, to prepare them (somewhere between days to months)." Sharp Decl. 4:21-23, Feb. 8, 2012 (ECF No. 35)(emphasis added). At trial, Mr. Sharp essentially reiterated this point, although he added that Mr. Shart had told him his "secretary, Marie" had also worked on them. Trial Tr. 151:7-10, April 26, 2012. Mr. Sadler's testimony was even more vague; he stated that Mr. Shart had told them "that Elke and his bookkeeper Marie had spent a long time working up the accountings." Sadler Decl. 4:4-5, Feb. 8, 2012 (ECF No. 36) (emphasis added).

It is clear that this hearsay testimony reflects slightly differing versions of the same conversation with Mr. Shart on January 8, 2009, but it is so vague and contradictory as to be unhelpful. One witness recalled Mr. Shart saying that his wife

29

had been involved with billings, while the other remembered Mr. Shart saying she had worked on accountings, a significant difference in this case. Both mentioned that "Marie" was also involved, although Mr. Sadler identified her as Mr. Shart's secretary, while Mr. Sharp believed she was his bookkeeper. The record reflects that Ms. Schardt employed a women named Marie as her assistant in California, but there is no evidence that Marie had any involvement in these matters between July 2008 and January 2009.

Further, there is other evidence regarding who prepared the billings, as opposed to accountings, that squarely contradicts Mr. Sharp's and Mr. Sadler's testimony. Ms. Haig did not begin to receive monthly billings from Greystone until July 2008. Those billings came from Susan Rhea, who was Greystone's bookkeeper throughout this period. Ms. Haig testified to having numerous discussions with Ms. Rhea in 2008 about them. Indeed, in her December 26, 2008 letter, Ms. Haig wrote to Mr. Shart that, "I looked through my files and the only details of billings that I have received have been for the current year 2008, which Susan prepared." Ms. Haig's trial declaration is consistent with this statement; all the billings that she received came from Greystone's bookkeeper. The record below supports a conclusion that Ms. Schardt did not prepare any billings.

As to Greystone's accountings, two are in evidence. One was the 2005-2007 accounting, enclosed in the FedEx package sent to Ms. Haig in July 2008, and the other was the 2008 accounting, sent to Ms. Haig six months later, on January 5, 2009. The bankruptcy court correctly noted the absence of any evidence that

30

Ms. Schardt prepared the accounting sent in the FedEx package. Appellants infer that she must have prepared the documents because the airbill identified her as the sender. Yet, Ms. Schardt provided the only direct testimony on the topic. She testified that she did not remember sending any accountings to Ms. Haig, and did not think anyone in her office did, either. Trial Tr. 168:13-17, May 3, 2012. Moreover, the handwriting on the FedEx label was not hers, and she did not recognize it. Id. at 168:18-24. Ms. Schardt suggested that her husband, or someone else at Greystone, could have sent the package. Mr. Shart confirmed that he had previously used his wife's FedEx account because he did not have one for Greystone. Trial Tr. 170:23-24, Apr. 27, 2012. He also testified that Ms. Schardt was not involved in the accounting.

At trial Ms. Schardt denied ever working on any bills, or preparing any accounting. She did review Ms. Haig's December 26, 2008 letter and the proposed billing adjustments with Ms. Rhea, Greystone's bookkeeper, during her holiday visit. She also testified that she advised Ms. Rhea to complete the accounting she was working on, and to transmit it to Ms. Haig. It is wholly consistent with the record below that Ms. Haig received Ms. Rhea's accounting on January 5, 2009, which was later discussed between Mr. Shart, Mr. Sadler, and Mr. Sharp on January 8, 2009. Regardless, Ms. Schardt's review of Ms. Haig's letter, and her general advice to Ms. Rhea, the bookkeeper, did not equate to preparation of an accounting. More importantly, these actions do not evidence co-ownership or any right to participate in the management of her husband's horse business as

31

is necessary to establish a partnership.  Because the bankruptcy court chose from two permissible views of the evidence, and its findings are plausible in light of the record, there was no error.  Lewis, 681 F.3d at 999.

**b)  Ms. Schardt may have maintained one bank account and check register for Mr. Shart's business and assisted in preparation of tax returns.**

The bankruptcy court found that, prior to 2005, Ms. Schardt and her assistant would enter some information in a check register for Mr. Shart's company, Malibu.  Additionally, Ms. Schardt was a signatory on a joint account for Malibu prior to Mr. Shart's move to Tennessee, from which she would wire funds to him while he was buying horses overseas.  Ms. Schardt would also act as a messenger by occasionally taking documents to Mr. Shart's California accountants.  The court concluded that these actions were "simply evidence of a married couple and [do] not in any way give rise to a partnership."  Shart, 505 B.R. at 26.

As to this finding, Appellants simply disagree with the inferences drawn by the bankruptcy court.  They argue that this evidence establishes that Ms. Schardt "maintained" the check register for Malibu, was a co-signer on Mr. Shart's business account, and "provided information" to his business accountant. The record does not support these assertions.  Ms. Schardt testified that before Mr. Shart moved his business and bank accounts to Tennessee in 2005, both of them used the services of the same individual to review their separate bills and write checks.  This arrangement ended once Mr. Shart moved his business to Tennessee in 2005.  Similarly, Ms. Schardt testified that the

32

joint bank account existed before Mr. Shart moved to Tennessee, and was an accommodation to his need for funds while traveling overseas. Again, this arrangement stopped after Mr. Shart moved to Tennessee in 2005. Ms. Schardt also testified that she still occasionally took documents for her husband to his California accountant, but that she did not prepare those documents. Appellants offered no evidence to contradict Ms. Schardt's testimony.

Co-ownership of a bank account, by itself, would not establish a partnership. Cal. Corp. Code § 16202(c)(1). Moreover, no inference as to management or control of Mr. Shart's business can be made from these facts. The evidence only establishes that Ms. Schardt, or her assistant, entered information in a check register; it does not require the conclusion that Ms. Schardt wrote checks on Mr. Shart's business account. While Ms. Schardt may have wired funds to her husband in the early 2000's as an accommodation when he traveled overseas, this is in stark contrast to the situation in Tsurukawa II where the debtor deposited, wrote, and signed "hundreds of checks," including payments to herself. It is also unclear how, or why, a wife's delivery of documents to her husband's out of state accountant advances Appellants' claims that Ms. Schardt was in a partnership with her husband. We agree with the bankruptcy court that this is simply evidence of transactions typical in a marriage rather than an indication of Ms. Schardt's co-ownership or control of her husband's business, especially given that these events occurred well before the events pertinent to the fraud in 2007.

33

### c) Ms. Schardt's activities in December 2008 and January 2009.

The cornerstone of Appellants' challenge rests on Ms. Schardt's actions during her visit to the Farm for Christmas, 2008. She arrived for the holidays on December 19, 2008, to find a quickly escalating business dispute between her husband and a primary client. The day before, her husband had sold two horses over Ms. Haig's objections, prompting a written demand for an accounting from Ms. Haig's attorney the same day Ms. Schardt arrived. Ms. Haig subsequently made numerous calls to the house during Ms. Schardt's visit. On December 26, 2008, Ms. Haig sent the letter to Mr. Shart detailing 10 errors in Greystone's billings.

Aware that something was going on, Ms. Schardt spoke with Greystone's bookkeeper, Ms. Rhea, about the ongoing dispute. The bookkeeper complained about numerous calls and complaints from Ms. Haig challenging her accounting. Ms. Schardt gave her some advice as to how to handle the situation. She also reviewed the matters raised in Ms. Haig's December 26, 2008 letter with her husband and Ms. Rhea. She made handwritten notes based on what she discovered on a copy of the letter. There is no evidence that these notes were provided to anyone.

In early January 2009, Ms. Schardt also reviewed two of her husband's letters, including his response to Ms. Haig's December 26, 2008 letter. She examined them for grammatical errors because he would dictate half in German, half in English and his letters were always proof-read by someone. Still, Ms. Schardt was adamant that she did not change the substance of

34

the letters. She acknowledged, however, that she suggested he retain counsel and made inquiries on his behalf.

Finally, in Shart I, the Panel noted that Ms. Schardt may have provided negotiating advice to Mr. Shart, based on Ms. Haig's declaration. The only evidence of advice is Ms. Haig's testimony that Mr. Shart "specifically told her" that Ms. Schardt had advised him to demand payment of $250,000.00 before releasing the horses. However, Ms. Haig's declaration was controverted by her husband's statement that she was so upset that she did not speak to Mr. Shart during their January 7-9, 2009 visit to Greystone.

The bankruptcy court separately addressed Ms. Schardt's handwritten notes, her review and editing of her husband's correspondence, her discussions with the bookkeeper, and the prospect that she may have provided negotiating advice. In sum, it discounted these items as evidence of a partnership, and considered them merely assistance from a spouse who happened to be an attorney. We perceive no clear error in that analysis.

Appellants view these same acts as evidence that Ms. Schardt took an active role in her husband's business. They find it implausible that a lawyer, such as Ms. Schardt, would not have done more, or would not have actually advised her husband on his business negotiations. Given the evidence presented, however, the bankruptcy court's findings are entirely plausible. They point to a wife assisting her husband with a business dispute. These acts fail to show any control or management of Mr. Shart's underlying business. Nor did Ms. Schardt hold herself out as a co-owner to Appellants or anyone else. Her involvement was

35

limited to aiding her husband in his dispute with Ms. Haig, rather than running the business, and later as a co-defendant in the state court litigation brought by Appellants. We agree with the bankruptcy court's findings as to these actions.

### d) Ms. Schardt signed letters on Greystone letterhead relating to Greystone's business matters.

On June 2, 2009, Ms. Schardt sent a letter to four of her husband's customers regarding the state court litigation. It was written on Greystone letterhead, but Ms. Schardt signed the letter in her individual capacity. In the letter, she explained that, although she co-owned the Farm with Mr. Shart, she had no interest in his horse business. The letter accused Ms. Haig of pursuing a personal vendetta against her husband. Enclosed with the letter was a copy of Mr. Shart's answer and counterclaim, which sought damages against Ms Haig. Ms. Schardt explained that she sent the letters after Appellants published ads and posted fliers at horse shows about their missing horses, and Mr. Shart's customers began making phone inquiries about the missing horses.

The bankruptcy court remarked that "the fact that the letter may have been hate-filled is irrelevant to the issue of [Ms. Schardt] being a partner." Shart, 505 B.R. at 26. While her use of Greystone letterhead is some evidence of a connection between Ms. Schardt and her husband's business, she makes no representations in the letter as to holding any position with that business. To the contrary, she disclaims any ownership in the business and clearly identifies herself as the owner's wife. The letter discusses her personal opinion of a pending state court lawsuit, in which she was a named defendant, and how that

36

suit has affected her personally.  The bankruptcy court's finding that the letter did not establish a partnership between Ms. Schardt and her husband is not clearly erroneous.

**2.    The Pre-Litigation Declaration.**

Before Appellants filed the instant adversary action, Ms. Schardt executed a declaration dated July 20, 2010, which was filed in the bankruptcy case.  The record does not reflect the context in which she made the declaration, although footers on that document, and the appended certificate of service, indicate that the declaration was filed in connection with a motion for protective order regarding a Rule 2004 examination of Ms. Schardt.  In the declaration, Ms. Schardt gives an overview of the history of the dispute.  With respect to Ms. Haig and Greystone, she wrote that "we afforded her service above and beyond the call."  She also stated that the "second barn at Malibu" was built "entirely from the funds of Malibu, my husband and I."  Additionally, she referenced "Debtors" collectively, rather than her husband, individually, when describing efforts to recover past due boarding fees and the sale of horses. Appellants view these statements as an admission from Ms. Schardt that she was heavily involved in, and knew of, her husband's business.  They contend the bankruptcy court, which does not mention the declaration in its opinion, erred by failing to give it the conclusive weight it deserves.

At trial, Ms. Schardt was extensively examined about the declaration.  With regard to her statement that "we afforded [Ms. Haig] service above and beyond the call," she explained that she was referring to the fact that Ms. Haig's children had lived

37

at Greystone, and been taken care of there. She was not referring to horse-related services, of which she lacked personal knowledge, but to extra, "personal things." Trial Tr. 154:3-12, May 3, 2012. One of Ms. Haig's teenage daughters lived at Greystone permanently in 2007 and 2008. Ms. Schardt also testified that she opted not to go to Greystone for Christmas in 2007 because Ms. Haig's teenage son would be staying there for the month, and she felt this would interfere with family time.

Similarly, when questioned about the Barn, Ms. Schardt testified that she believed some of the funds from the sale of property she and Mr. Shart owned in California were used "for the building of barns and rings and whatever" at Greystone, although she didn't know what was actually being built. Id. at 158:8-159:3. Ms. Schardt was asked why she would say this in light of other inconsistent evidence at trial that indicated Ms. Haig had paid $396,000.00 for the barn construction. She responded that the pre-litigation declaration was based on her beliefs at the time, and that she had learned a lot since then, over the course of the litigation.

"'Clear error is not demonstrated by pointing to conflicting evidence in the record.'" Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 422 F.3d 782, 795 (9th Cir. 2005)(quoting United States v. Frank, 956 F.2d 872, 875 (9th Cir. 1991)). Rather, it exists if the bankruptcy court's findings of fact are illogical, implausible, or without support in the record. Hinkson, 585 F.3d at 1262. The bankruptcy court sifted through the voluminous evidence and testimony submitted in this case, and evaluated the credibility of all witnesses. Its determination that no

38

partnership existed between the spouses is clearly predicated upon crediting Ms. Schardt's testimony that she had no interest, or right to participate, in Mr. Shart's underlying business. We must defer to the trial judge's determinations as to Ms. Schardt's credibility. Anderson v. City of Bessemer City, N.C., 470 U.S. at 574. Moreover, the court's findings are amply supported by the evidence in the record, and, therefore, are not clearly erroneous. It was unnecessary for the court to comment on every piece of evidence presented at trial. See In re Braithwaite, 197 B.R. 834, 835 (Bankr. N.D. Ohio 1996) (quoting Erickson Tool Co. v. Balas Collet Co., 227 F. Supp 226, 234-35 (N.D. Ohio 1967), aff'd 404 F.2d 35 (6th Cir. 1968))("'The Court need not fragmentize the evidence and make extensive findings to negative every offer of proof which has failed to persuade it . . . .'").

**3.  The Timing of Ms. Schardt's Involvement.**

The bankruptcy court repeatedly noted that Ms. Schardt's involvement occurred predominantly in 2009, whereas the fraudulent actions of Mr. Shart that gave rise to his nondischargeable liabilities occurred in 2007. Appellants argue that this finding was clearly erroneous because of the evidence that Ms. Schardt sent the FedEx package in July 2008, and they believe that she was involved much earlier. They also contend Mr. Shart's fraud was not limited to actions taken in 2007, but continued until sometime in 2010.

The timing of Mr. Shart's fraud is significant only if vicarious liability exists, as to Ms. Schardt, by virtue of a partnership. In that instance, it would be necessary to

39

establish the date the partnership was created, because a new partner is generally not liable for the debts of an existing firm.  See 48 Cal. Jur. 3d Partnership § 89 (2014); Cal. Corp. Code § 16306(b)("[a] person admitted as a partner into an existing partnership is not personally liable for any partnership obligation incurred before the person's admission as partner.").[12]  Because no partnership ever existed, Ms. Schardt is not vicariously liable for any partnership debts.  Therefore, the timing of Mr. Shart's fraud is immaterial and need not be addressed further.

**C.    Tsurkawa II Does Not Compel a Different Result as to the Existence of a Partnership.**

Appellants also contend that the bankruptcy court clearly erred in its finding that no partnership existed because Ms. Schardt was more extensively involved in her husband's business than the debtor/wife in Tsurukawa II, where a partnership was found to exist.  The comparison is ill founded.  Unlike Ms. Schardt, Mrs. Tsurukawa was the owner of the business and repeatedly held herself out as such.  Tsurukawa II, 287 B.R. at 522.  As owner, she held the legal right to control the management of the business, even though she chose not to exercise

---

[12] This would preclude vicarious liability for Mr. Shart's fraudulent procurement of the Kenworth truck, Motor Home 2, or the Flowers Land, all of which he obtained in 2007, well before the earliest possible date of the partnership advanced by Appellants.  Mr. Shart's liability for the second set of horses, however, arose in 2009.  While the failure to establish a partnership moots the issue, it appears that his liability for the horses may have been founded on conversion rather than fraud. The only issue preserved on appeal, however, is the nondischargeability of damages for fraud under § 523(a)(2)(A).

40

such right. Id. Moreover, Mrs. Tsurukawa contributed the initial capital for the business, signed the lease for the company, opened the company bank account, wrote and deposited checks, and applied for business credit cards. Id. She also participated in the "profits" of the business by taking almost $1 million in income and benefits from the business. Id. at 522-24.

In contrast, there is no evidence that Ms. Schardt ever held herself out as having an interest in her husband's underlying business. The only public manifestation of any relationship between her and her husband's business remains the letter written on Greystone stationery to her husband's clients discussing the state court lawsuit. Even then, she disclaimed any interest in the business, identified herself as Mr. Shart's wife, and signed the letter in her individual capacity. Whereas Mrs. Tsurukawa had a legal right to control the business as its named owner, Ms. Schardt had no ownership interest in Greystone. Nor is there evidence that she had the right to participate, or actually participated, in the management of her husband's business. Unlike Mrs. Tsurukawa, there is also no evidence that she shared in the profits of her husband's business. Rather, she assisted her husband in one discrete business dispute. Once sued, she also participated in the state court litigation. These actions did not establish a partnership.

**D.    Imputation of Fraudulent Intent**.

Under California law, partners are jointly and severally liable for partnership debts, Cal. Corp. Code § 16306(a), including damages for fraud. Tsurukawa II, 287 B.R. at 521.

41

Under Huh, however, more is needed to except a partner's vicarious liability from discharge under § 523(a). The creditor must establish the debtor's individual culpability rather than relying exclusively on the co-debtor or nondebtor partner's bad acts. Huh, 506 B.R. at 271. The debtor/partner need not have actively participated in the fraud. Id. at 271. Instead, a creditor seeking to impute another partner's fraud for purposes of § 523(a)(2)(A) need only show the debtor "knew or should have known" of the other partner's fraudulent activities. Id. at 271-72.

Here, the bankruptcy court found that no partnership existed between Ms. Schardt and her husband. It did not clearly err in that determination. In the absence of a partnership, Ms. Schardt is not vicariously liable for her husband's fraud and the question of what she knew or should have known, under the Huh analysis, becomes immaterial. No further examination as to her culpability is required.

**CONCLUSION**

To prevail on their nondischargeability claims under § 523(a)(2)(A) against Ms. Schardt, Appellants were required to prove on remand that she: (1) was vicariously liable for her husband's fraud as his business partner, and (2) knew or should have known of his fraudulent conduct. The bankruptcy court's decision that Ms. Schardt was not a partner and, therefore, not vicariously liable for the damages caused by her husband's fraud, is supported by considerable evidence. The lower court's findings are plausible in light of the entire record, which establishes Ms. Schardt's limited involvement in a business

42

dispute, rather than a right to control her husband's business. Appellants' disagreement with those findings, based on unpersuasive or conflicting evidence, does not render them clearly erroneous.

Having reviewed the totality of the record, we perceive no clear error in the bankruptcy court's decision on remand. It is, therefore, AFFIRMED.